**GEORGIA STATE CONFERENCE OF BRANCHES OF NAACP, et al., Plaintiffs,**

v.

**STATE OF GEORGIA, et al., Defendants.**

No. CV482–233.

United States District Court, S.D. Georgia, Savannah Division.

April 5, 1983.

Patrick W. McKee, Asst. Atty. Gen., Atlanta, Ga., for State.

C.O. Oxford, Americus, Ga., for Americus.

Thomas F. Richardson, Macon, Ga., for Bleckley.

William M. Fulcher, Augusta, Ga., for Burke.

Nathan G. Knight, Newnan, Ga., for Coweta.

James W. Hurt, Cordele, Ga., for Crisp.

Ronald W. Hallman, Claxton, Ga., for Evans.

J. Franklin Edenfield, Swainsboro, Ga., for Jefferson.

G. Stuart Watson, Albany, Ga., for Lee.

Charles Jones, Hinesville, Ga., Ronald H. Rentz, Colquitt, Ga., for Liberty.

Randall Chew, Pelham, Ga., for Pelham.

C. Ronald Barfield, Thomaston, Ga., for Thomaston.

Charles K. Howard, Atlanta, Ga., for Vidalia.

Rose Firestein, Savannah, Ga., for individual plaintiffs.

David F. Walbert, Atlanta, Ga., for NAACP plaintiffs.

## ORDER

EDENFIELD, District Judge.

Before the Court is plaintiffs' motion for class certification of the above-styled case. Simply stated, this issue has engendered controversy as is evidenced by the sheer volume of paper work filed with the Court as of this date. However, much of the

evidence proffered by defendants in support of their motions to deny class certification is more properly addressed to the merits of the action. In considering plaintiffs' motion, actually drawing this distinction has been difficult. The Court has carefully considered the arguments and evidence offered by all the parties and has determined that this action should proceed on the class basis.

## Background of the Case

The instant action was filed on June 8, 1982, by forty-five (45) individual plaintiffs through their next friends, the Georgia State Conference of the Branches of NAACP, and the Liberty County Branch of the NAACP against the State of Georgia, the State Superintendent of Schools, the State Board of Education, and Liberty, Lee, Bleckley, Crisp, Americus, Miller, Jefferson, Burke, Vidalia, Evans, Pelham, Thomaston, and Coweta School Districts.

In their complaint, the plaintiffs stated that they seek declaratory and injunctive relief against the defendants in order to end alleged intentional racial discrimination in the public schools in the State of Georgia. Plaintiffs contend that black school children in Georgia, including the individual plaintiffs and the members and children of the State Conferences of Branches and Liberty County NAACP, have been assigned to classrooms within biracial schools on the basis of their race. The plaintiffs allege that the assignment of these children to disproportionately black classes results from the operation of intentional racial discrimination rather than racially neutral criterion such as ability or achievement grouping. Plaintiffs claim that the result of the disproportionate classroom configurations, they and the class they seek to represent have suffered severe educational deficits which must be remedied.

Plaintiffs also seek relief from the allegedly racially discriminatory administration of the special education program in the State of Georgia. It is alleged that black school children are erroneously classified as being educable mentally retarded as a means of removing them from normal classrooms or excluding them from programs for specific learning disabled children. Plaintiffs further contend that this misclassification of black children is racially motivated and has a devastating effect on these children's lives because of the stigma associated with being identified as mentally retarded and the diminution of their educational opportunities. Finally, plaintiffs claim that the misclassification of non-handicapped or specific learning disabled children as educable mentally retarded also excludes them from appropriate academic placements because of a real or attributed handicap.

Plaintiffs' claims of intentional racial discrimination in classroom assignment and misclassification of black students as mentally retarded arises under the Thirteenth and Fourteenth Amendments to the United States Constitution; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.;* and the Equal Educational Opportunities Act, 20 U.S.C. § 1701, *et seq.,* and is actionable under those provisions and 42 U.S.C. § 1983. Their claim of discrimination against otherwise qualified handicapped children in misclassifying them as educable mentally retarded arises under § 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794, the Fourteenth Amendment to the United States Constitution, and is actionable under those provisions and 42 U.S.C. § 1983.

In delineating the parameters of the class, the previously described multiplicity of parties and claims have been grouped into several categories. The plaintiffs divide into two groups: (1) the state-wide organization (Georgia State Conference of Branches of NAACP); and (2) the local plaintiffs. The group of local plaintiffs includes two subclasses to include the individual black children and the Liberty County NAACP. The defendants are the State of Georgia and the thirteen local school districts. The two basic claims are: (1) that black children have been tracked into racially malapportioned classrooms in otherwise integrated schools; and (2) that black students have been misclassified as being

Educable Mentally Retarded (EMR) because of their race. Plaintiffs have also raised a third claim under § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, asserting that the misclassification is also discrimination on the basis of a handicap. Plaintiffs state that the factual context for this claim is the same as plaintiffs' racial claim on misclassification. For purposes of determining whether a class should be certified, plaintiffs have asked the Court to consider this third claim subsumed in the racial class. In each instance, the gravamen of the claim is that black students' ability and level of achievement have not been validly and non-discriminatorily evaluated.

To summarize, plaintiffs, defendants and claims are aligned as follows:

(1) the State NAACP raises both claims against the State on behalf of all black children in the State of Georgia;

(2) the State NAACP raises each claim against each local defendant on behalf of the black children in the respective school system;

(3) all local plaintiffs raise the racial tracking claim against the State of Georgia on behalf of the black students in the State;

(4) each local plaintiff states the racial tracking claim against its own local school district;

(5) all local plaintiffs, or alternatively those who have been classified as EMR, including the Liberty County NAACP, raise the misclassification claim against the State of Georgia on behalf of the black students in the State who have been or will be in EMR programs; and

(6) each local plaintiff, or alternatively each one who has been classified as EMR, including the Liberty County NAACP, raises the misclassification claim against its own school district on behalf of the black students in the district who have been or will be in the EMR programs.

Thus, the issue is whether each match of plaintiff(s), the group of black children sought to be represented, defendant, and claim, is appropriately treated as a class action.

At the hearing held on this matter December 13–14, 1982, much of the plaintiffs' documentary evidence was admitted by way of affidavit and the named plaintiffs were not required to testify. Plaintiffs and defendants each offered the testimony of a statistical expert. In reviewing the statistical evidence presented in support of class certification, some explanation with regard to its preparation is necessary. As a preface to the litigation, Dr. Martin M. Shapiro, plaintiffs' statistical expert, obtained a copy of the computer tapes from the Office of Civil Rights of the U.S. Department of Education (OCR). These tapes contained the Individual School Reports and School System Summaries for the years 1972, 1976, 1978, and 1980. Data for Georgia were extracted from these tapes and the data for the school districts in nine metropolitan counties was removed.[1] The analyses of the remaining OCR data for Georgia were developed to provide summary statistical indices of racial disproportionality in each of four placement characteristics. The four indices represent measures of the degree of disproportional black/white student placement in the following categories:

(1) between the several schools of each school system;

(2) among the various classrooms within each school;

(3) in assignments to Educable Mentally Retarded programs;

(4) in assignment to Specific Learning Disability (SLD) programs.

Plaintiffs contend that these analyses demonstrate the existence of their putative classes of black students who have been affected by racial tracking and EMR placement throughout the State and in each local defendant school district.

1. The districts removed include: Fulton, City of Decatur, Gwinnett, DeKalb, Cobb, Clayton, City of Atlanta, Richmond, Muscogee, City of Savannah-Chatham County, and Bibb County.

*Statistical Genesis of the Issues*

Indices of disproportionality of black students in the reported classrooms.

The analysis of the racial composition of the sample of classrooms consisted of the calculation of indices of disproportionality of black students in the reported classrooms in light of the percentage of black students within the respective schools. The index that was used was a chi-squared divided by degrees of freedom which is represented by the following formula: $X^2/df$. An index of 1.7 or more was considered statistically significant in 1972 while an index of 1.37 indicates significance in 1976, 1978, and 1980. "Statistically significant" refers to the .05 level of confidence; that is, the distribution would normally occur no more than five times out of one hundred. The following table shows the total number of districts filing OCR reports each year and the number of systems in which classroom placement had a statistically significant racial impact:

| Year | Total Districts | Districts With Significant $X^2/df$ |
|---|---|---|
| 1972 | 165 | 139 |
| 1976 | 151 | 145 |
| 1978 | 170 | 100 |
| 1980 | 85 | 77 |

Moreover, each of the original thirteen defendant school districts reported data with indices indicating a very high degree of racial separation among classes. The following table lists each local defendant and index of racial impact for 1972, 1976, 1978, and 1980.

| District | 1972 $X^2/df$ | 1976 $X^2/df$ | 1978 $X^2/df$ | 1980 $X^2/df$ |
|---|---|---|---|---|
| Americus | 11.134 | 8.625 | 3.327 | 3.438 |
| (Bleckley) | 6.788 | 3.736 | 5.920 | 6.157 |
| Burke | 5.058 | 3.343 | 3.642 | 3.935 |
| Coweta | 5.604 | 2.292 | 2.472 | 1.932 |
| Crisp | 5.785 | 4.126 | 4.488 | 5.248 |
| Evans | 6.270 | 5.322 | 4.383 | 3.995 |
| Jefferson | No rept. | 6.120 | 6.632 | 4.155 |

**2.** The Cochran City School System was consolidated with the Bleckley County School System between 1976 and 1978. In addition, prior to the hearing on class certification, the Bleckley County School District settled this lawsuit. The Thomaston City School District entered

| District | 1972 $X^2/df$ | 1976 $X^2/df$ | 1978 $X^2/df$ | 1980 $X^2/df$ |
|---|---|---|---|---|
| Lee | 9.467 | 9.206 | 6.422 | No rept. |
| Liberty | 7.086 | 5.731 | 4.232 | No rept. |
| Miller | 5.369 | 8.884 | 8.915 | 8.523 |
| Pelham | 11.923 | 6.365 | 7.250 | 6.135 |
| (Thomaston) | 4.346 | 5.353 | 5.290 | 3.361 |
| Vidalia | 12.004 | 5.041 | 5.941 | 4.812 |
| (Cochran)[2] | 17.667 | 8.541 | Consolidated | |

Plaintiffs submit that the foregoing tables clearly demonstrate the existence of a state-wide class and a class in each local defendant school district of black students who have been affected by the defendants' alleged racial tracking practices.

To demonstrate the statistical basis of their EMR claim, a similar type of analysis was done on the racial composition of the EMR classes in 1976, 1978 and 1980.[3] A standard unit normal or "Z-score" was used to determine the disproportionality of black students in EMR. It was calculated by comparing the proportion of black students in EMR placement to the proportion of black students in each school. A Z-score of +1.96 indicates a statistically significant overrepresentation of black students in a category. Plaintiffs submit that such an overrepresentation of black students in the EMR classification gives rise to an inference of misclassification of some of those students.

In support of their assertion of a state-wide class of the number of districts that reported data in 1976, 1978 and 1980 and those that had a significant overrepresentation of blacks in EMR classes, the following table shows the statewide distribution of districts with material Z-scores:

| Year | Total Districts | Significant Z-score |
|---|---|---|
| 1976 | 152 | 139 |
| 1978 | 169 | 148 |
| 1980 | 85 | 79 |

into an agreement in principle with plaintiffs on March 16, 1983.

**3.** Racial data on special education categories was not reported in 1972.

The table below shows the alleged over-representation of blacks in the EMR programs in the local defendant districts:

| District | 1976 Z-score | 1978 Z-score | 1980 Z-score |
|---|---|---|---|
| Americus | 6.360 | 6.344 | 6.191 |
| (Bleckley)* | 7.316 | 10.917 | 10.870 |
| Burke | 2.631 | 2.796 | 1.449 [5] |
| Coweta | 8.792 | 9.650 | 10.570 |
| Crisp | 7.986 | 6.504 | 8.487 |
| Evans | 6.821 | 4.866 | 6.684 |
| Jefferson | 3.031 | −1.306 [4] | 1.842 [5] |
| Lee | 9.081 | 9.136 | No rept. |
| Liberty | 8.737 | 7.997 | No rept. |
| Miller | 9.468 | 7.354 | 7.959 |
| Pelham | 7.712 | 5.106 | 4.818 |
| (Thomaston)* | 7.601 | 6.972 | 7.204 |
| Vidalia | 3.968 | 5.386 | 5.746 |
| (Cochran) | 8.407 | Consolidated with Bleckley County | |

* As stated earlier, this defendant school district settled with plaintiffs immediately prior to the class certification hearing and Thomaston settled during the pendency of this motion.

Plaintiffs submit that the data contained on the preceding tables are sufficient to establish both a state-wide class and twelve local subclasses of black EMR students on whose behalf plaintiffs can assert their racial EMR misclassification claim.

Plaintiffs bolstered their attack on the alleged misclassification of blacks by examining *some* EMR students' special education files. In Georgia, a student must have an IQ score that registers between two and three standard deviations below the mean of 70. Therefore, plaintiffs assert that the placement of children with IQ scores above 69 or 70 in an EMR program raises at least an inference that misclassification has occurred. Moreover, plaintiffs contend that there were at least 121 black children in the local defendant school districts who were placed or retained in EMR programs when their most recent psychological evaluation contained an IQ score of 70 or above on a test individually administered by a psychologist or psychometrist.

4. The negative number indicates that there was an underrepresentation of blacks in EMR in Jefferson County in 1976. Plaintiffs state that it was not statistically significant.

*The Import of Falcon to the Lawsuit*

Immediately following the filing of this lawsuit, the Supreme Court announced its decision in *General Telephone Company of the Southwest v. Mariano S. Falcon.* The import of this most recent pronouncement on class certification has provided the focal point for dispute among the parties to this lawsuit and will thus be the starting point for this Court's analysis of the motion for class certification.

In *General Telephone Company of the Southwest v. Falcon,* 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), (hereinafter *Falcon*), the Supreme Court rejected the "across the board" approach which had been followed by the Fifth Circuit in class certification of Title VII cases. Falcon, after being denied a promotion by his employer, alleged that he had been passed over for promotion because of his national origin. He further alleged that his employer's promotion policy operated against Mexican-Americans as a class. Without conducting an evidentiary hearing, the District Court certified a class consisting of Mexican-American employees and Mexican-American applicants who had not been hired. In holding that the District Court erred in permitting plaintiff to maintain a class action on behalf of both employees who were denied promotion and applicants who were denied employment, the Court stated that:

> An individual litigant seeking to maintain a class action under Title VII must meet "the prerequisites of numerosity, commonality, typicality, and adequacy of representation specified in Rule 23(a). *General Telephone Co. v. EEOC,* 446 U.S. 318, 330 [100 S.Ct. 1698, 1706, 64 L.Ed.2d 319] (1980). These requirements effectively "limit the class claims to those fairly encompassed by the named plaintiff's claims." *Id.* 457 U.S. 147, 156, 102 S.Ct. 2364, 2369, 72 L.Ed.2d 740.

5. There was an overrepresentation of black students in EMR in 1980 in Burke and Jefferson Counties, but those overrepresentations were not significant at the .05 level of confidence.

Although the Court did not disagree with the theoretical basis of the Fifth Circuit's across-the-board rule—that racial discrimination is by definition class discrimination—it held that such a theoretical basis did not automatically mean that a class action could be maintained. On the issue of class certification in employment discrimination suits, the Court continued:

> But the allegation that such discrimination has occurred neither determines whether a class action may be maintained in accordance with Rule 23 nor defines the class that may be certified. Conceptionally, there is a wide gap between (a) an individual's claim that he has been denied a promotion on discriminatory grounds, and his otherwise unsupported allegation that the company has a policy of discrimination, and (b) the existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim and the class claims will share common questions of law or fact and that the individual's claim will be typical of the class claims. For respondent to bridge that gap, he must prove much more than the validity of his own claim. Even though evidence that he was passed over for promotion when several less deserving whites were advanced may support the conclusion that respondent was denied the promotion because of his national origin, such evidence would not necessarily justify the additional inferences (1) that this discriminatory treatment is typical of petitioner's promotion practices, (2) that petitioner's promotion practices are motivated by a policy of ethnic discrimination that pervades petitioner's Irving division, or (3) that this policy of ethnic discrimination is reflected in petitioner's other employment practices, such as hiring, in the same way it is manifested in the promotion practices. These additional inferences demonstrate the tenuous character of any presumption that the class claims are "fairly encompassed" within respondent's claim.

*Id.* 457 U.S. 157–58, 102 S.Ct. 2364, 2371. ■ In this case, the named plaintiffs have at least two different claims. How-

ever, their "generalized allegations that Defendants used subjective, racially . . . discriminatory criteria in making [placement] decisions are . . . similar." *Hawkins v. Fulton County,* 95 F.R.D. 88, 93 (N.D.Ga.1982). After *Falcon,* a crucial determination in the class certification decision is whether the differing claims of the assorted plaintiffs will require differing methods of proof for each plaintiff to make out his or her individual *prima facie* case of intentional racial discrimination. *Hawkins v. Fulton County, supra.* As Judge Evans noted in *Hawkins,*

> A significant portion of *Falcon* is directed at showing that the grouping of various types of discrimination claims, with all of their differences and nuances, into a single class action is almost antithetical to the Rule 23 requirements of commonality, typicality and adequacy of representation.

*Id.* at 93. In *Falcon,* Chief Justice Burger observed that the respondent's promotion claim was advanced under a disparate treatment theory while the applicants' class claim was advanced under a theory of "adverse impact." *Falcon, supra,* 102 S.Ct. at 2373. Earlier in the main opinion, Justice Stevens had noted that the District Court's bifurcated findings on liability demonstrated that the individual and class claims could have been handled separately. *Id.* 102 S.Ct. at 2372. In the instant case, it appears that the plaintiffs will attempt to prove their *prima facie* case under a disparate impact theory. And, at this juncture, it appears that maintenance of this action on a class basis will advance "the efficiency and economy of litigation which is the principal purpose of the procedure." *Id.,* quoting *American Pipe and Construction Co. v. Utau,* 414 U.S. 538, 553, 94 S.Ct. 756, 766, 38 L.Ed.2d 713 (1974). If the evidence proves that these goals will not be met, the class may be redefined or de-certified. However, the class representation showing required by Rule 23(a) still must contain a "specific presentation identifying the questions of law or fact that [are] common to the claims of [plaintiffs] and of the members of the

class [they seek] to represent." *Falcon, supra,* 457 U.S. 158, 102 S.Ct. at 2371.

The Court did not foreclose the possibility that an employee alleging discrimination in some aspect of his employment could, in some cases, represent rejected applicants. In footnote 15 of the opinion, the Court noted:

> If petitioner used a biased testing procedure to evaluate both applicants for employment and incumbent employees, a class action on behalf of every applicant or employee who might have been prejudiced by the test clearly would satisfy the commonality and typicality requirements of Rule 23(a). *Significant proof* that an employer operated under a general policy of discrimination conceivably could justify a class of both applicants and employees if the discrimination manifested itself in hiring and promotion practices in the same general fashion, such as through entirely subjective decision making processes. In this regard it is noteworthy that Title VII prohibits discrimination. The mere fact that an aggrieved private plaintiff is a member of an identifiable class of persons of the same race or national origin is insufficient to establish his standing to litigate on their behalf all possible claims of discrimination against a common employer.

*Id.* 102 S.Ct. at 2371–72 n. 15 (emphasis added).

Plaintiffs state that these factors can be translated into the educational terms of the instant case. The argument proffered is that under *Falcon,* a non-EMR could represent the EMR students on the misclassification claim if there was evidence that: (1) he or she was placed in racially malapportioned regular classes; (2) the racial malapportionment was typical of regular classroom assignments in the district, *and either* (3) the racial tracking was motivated by a policy of discrimination that pervaded the defendant's practices, *or* (4) the same general type of discrimination was evident in the

defendant's placement decisions for both regular and EMR classes.[6]

By way of rebuttal, defendants assert that the true lesson of *Falcon* lies in the maxim that "being a victim of discrimination does not give an individual a license to abrogate Rule 23." With that proposition, this Court has no disagreement. And it is also apparent that, after *Falcon,* class suits will not be certified absent a careful inquiry by the district court into the characteristics of the class representatives as dictated by Rule 23. What this Court does not find in *Falcon* is a total abrogation of the class suit as a valuable tool in the prosecution of discrimination actions, whatever their nature. In addition to all the language critical of the "across the board" rule as applied by the courts in employment discrimination suits, the essence of the Court's opinion, as it relates to the class action device, is as follows:

> The district court's error in this case, and the error inherent in the across the board rule, is the failure to evaluate carefully the legitimacy of the named plaintiff's plea that he is a proper class representative under Rule 23(a).

*Id.* 102 S.Ct. at 2371–72. This error can be avoided not by abandoning the use of the class action, but by examining the proposed action within the context of Rule 23(a) requirements. *See Freeman v. Motor Convoy, Inc.,* 700 F.2d 1339 at 1347 (11th Cir. 1983) ("[A] careful and thorough analysis of the requirements of Rule 23(a) is precisely what the Supreme Court mandated in *Falcon*").

### The Standards of Rule 23

Plaintiffs have sought class certification under F.R.Civ.P. 23(b)(2). To qualify under that provision, the action must satisfy all the requirements of both rule 23(a) and rule 23(b)(2). The relevant portions of rule 23 are as follows:

(a) Prerequisites to a Class Action.

One or more members of a class may sue or be sued as representative parties

---

**6.** Plaintiffs state that this type of proof is necessary only when the named plaintiff does not

share the characteristic which defines the class asserting the claim.

on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

(b) Class Actions Maintainable.

An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition: (2)the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

■ In a class action, the trial court may not allow its view of the merits to determine the outcome of the class certification issue. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974). The important inquiry at this stage of the proceedings is contained in the previously enumerated criteria of Rule 23, to which I now will turn.

### 1. Numerosity

■ The plaintiff's allegations are sufficient to comply with the requirements of Rule 23(a)(1). There must be some evidence or a reasonable estimate of the number of purported class members. *Zeidman v. J. Ray McDermott & Co., Inc.,* 651 F.2d 1030, 1036, 1038 (5th Cir.1981). At this point in the litigation, there are at least 25 named plaintiffs remaining in the lawsuit. According to the plaintiff's statistics, there are at least several hundred black students who attend public school in each local defendant district. Moreover, there were a minimum of 39 black students and maximum of 151 black students in EMR classes in each of the defendant districts during the 1978–79 school year. Each year, as yet unidentified blacks will enter such defendant school system and will be placed in either regular or EMR classes. The proper focus is not on numbers alone, but on whether joinder of all members is practicable in view of the numerosity of the class and all other factors. *Holland v. Steele,* 92 F.R.D. 58, 63 (N.D.Ga.1981) *citing Phillips v. Joint Legislative Committee, etc.,* 637 F.2d 1014, 1022 (5th Cir.1981). The numerosity and/or impracticability requirement of Rule 23(a)(1) has been satisfied. *See also Wright & Miller, Federal Practice and Procedure: Civil* § 1762.

### 2. Common Questions of Law or Fact

■ Professor Miller has made the following observations on the "commonality" requirement.[7] This portion of the Rule is phrased in the disjunctive—common questions of law *or* fact. Thus, if there is a common issue of liability, Rule 23(a)(2) is satisfied. Similarly, if there is a common fact question relating to . . . a practice of discrimination, . . . or the existence of a particular course of conduct, the Rule is satisfied. Professor Miller also noted that Rule 23(a)(2) contains no qualitative or quantitative aspect. Common questions need not be important nor controlling. In fact, one significant common question of law or fact will satisfy this requirement. The question of whether a school system maintained racially discriminatory policies has been found sufficient for Rule 23(a)(2). *Long v. Thornton Township High School Dist. 205,* 82 F.R.D. 186 (N.D.Ill.1979).

■ The complaint presents allegations of intentional discrimination against plaintiffs and putative class members on the basis of race. The complaint further describes a wide spread practice among the defendants in which black public school students are either assigned to classrooms below their level or misclassified as EMR solely because of their race. Where broad discriminatory policies and practices constitute the gravamen of a class suit, common questions of law or fact are necessarily presented. *Midwest Community Council v. Chica-*

---

7. A. Miller, *An Overview of Federal Class Actions: Past, Present, and Future* 24 (Federal Judicial Center December, 1977) (hereinafter cited as *Overview*).

*go Park Dist.,* 87 F.R.D. 457, 460 (N.D.Ill.E. D.1980). However, after *Falcon,* it is clear that a further inquiry must take place. The commonality requirement cannot be assumed to have been met merely because the allegation is one of discrimination. Cognizant of the need for heightened judicial scrutiny of the facts of the named plaintiffs' case in determining the appropriateness of class certification, selected statistics proffered by plaintiffs which support the existence the common questions are discussed.

In evidence are the results of the elementary and secondary school survey from the 1978–79 school year. As this information demonstrates the rate of placement of black students in EMR and SLD classes, it is relevant to the general question of whether the disparate impact demonstrated is the result of intentional racial discrimination in the defendants' placement practices. As stated, the data is reflective of the 1978–79 school year.

1. Americus City—The total enrollment was 3,540 students, with white students comprising 1,490 of that total (42%) and black students, 2,044 or 58%. There were 74 black students in EMR programs that year (95%) and 4 white students (5%). Conversely, out of the 41 students classified as learning disabled, 20 or 47% were black while 21 or 53% were white.

2. Burke County—The total enrollment was 4,115 pupils—3,194 (or 78%) black students and 915 (or 22%) white students. There were 64 black students in the EMR program (89%) and 8 white students (11%). In the SLD program, there were 12 black students (34%) and 23 white students (66%).

3. Coweta County—The total enrollment in that year was 8,277 students. This figure breaks down to 3,046 (or 37%) black students and 5,221 white students (or 63%). The EMR classes contained 207 students— 151 (or 73%) of these students were black while 56 (or 27%) were white. In the SLD classes, there were 220 students, with 91 black pupils (41%) and 129 (or 59%) white pupils.

4. Crisp County—The total enrollment in 1978–79 was 4,373 students. The black student population was 2,341 (or 54%) and the white student population, 2,032 (or 46%). There were 189 students in EMR classes. Seventy-eight per cent (78%) or 148 of these students were black while only twenty-two per cent (22%) or 41 were white. In SLD classes, a total of 63 students were enrolled—37 of these students were black (59%) while 26 (or 41%) were white.

5. Evans County—The total enrollment was 1,849 students. Forty-five per cent of these students (or 841) were black while 1,008 (or 54%) were white. Fifty-five of these black students (74%) were placed in EMR classes while 19 white students (26%) were in EMR classes. Seventeen black students (42%) were placed in classes for the learning disabled as were 23 (or 57%) white students.

6. Jefferson County—The total enrollment in 1978–79 was 4,009 students. Of this number, 3,008 (75%) were black and 998 (25%) were white. There were 102 students in EMR placements. Ninety-one (or 89%) were black and eleven (11%) were white. The learning disabled placements included 17 black students (61%) and 11 white students (39%).

7. Lee County—The total enrollment was 2,722 students. Of this number, 893 (or 33%) were black and 1,819 (67%) were white. There were 82 students placed in EMR programs. Sixty-seven, or 82%, of these were black while fifteen, or 18%, were white. There were 41 children classified as learning disabled—9 (or 22%) were black and 32 (or 78%) were white.

8. Liberty County—The total enrollment was 4,757 students. Black students comprised 45% of this total (2,140 pupils) while white students accounted for 53% of the total (2,524 students). There were 110 students in EMR classes. Ninety-five (or 86%) of these EMR students were black while 15 (or 14%) were white. There were 39 pupils assigned to learning disabled classes. Ten (or 26%) were black and 29 (or 74%) were white.

9. Miller County—The total enrollment was 1,492 students—598 (40%) were black and 894 (60%) were white. There were 58 pupils in EMR classes—fifty-three (or 91%) were black while 5 (or 9%) were white. There was one white student classified as learning disabled.

10. Pelham City—The total enrollment in 1978–79 was 1,874 pupils. There were 1,065 black students (57%) and 793 (42%) white students. The statistics were reported as follows:

| | Black | % | White | % | Total |
|---|---|---|---|---|---|
| EMR | 41 | 42 | 1 | 1 | 97 (sic) |
| LD | 3 | 38 | 5 | 63 | 8 |
| Speech Impaired | 42 | 55 | 35 | 45 | 77 |

The high number of placements in the category of speech impaired is significantly different from the other districts.

11. Vidalia City—There were 2,534 students enrolled in 1978–79. Of the fifty students classified as EMR, 19 (or 78%) were black while 11 (or 22%) were white. There were 57 children categorized as learning disabled. Nine (or 16%) were black and forty-eight (or 84%) were white.

For purposes of comparison, the Court performed its own rough statistical analysis on the preceding figures and the following results were obtained. In Column A, the percentage figure represents the number of black students in EMR classes in the district divided by the total number of blacks in the student population in the district; Column B represents the number of white students in EMR classes in the same district in the same year divided by the total number of white students. The districts having a majority of black students in the school population are starred.

| District | A | B |
|---|---|---|
| *Americus | 3.6% | .3% |
| *Burke | 2% | .8% |
| Coweta | 4.9% | 1% |
| *Crisp | 6.3% | 2% |
| Evans | 6.5% | 1.9% |
| *Jefferson | 3% | 1.1% |
| Lee | 7.5% | .8% |
| Liberty | 4.4% | .6% |
| Miller | 8.9% | .6% |
| *Pelham | 3.9% | .1% |
| Vidalia | 3.8% | .7% |

A cursory review of these statistics raises one immediate question which is apropos to every defendant. That is, why are black students uniformly represented in EMR classes in higher numbers than white students—especially in those districts with a majority of white students. Moreover, the statistics set forth earlier in this Order at p. 11 demonstrate that the question of overrepresentation of blacks in certain classrooms of the defendant districts is a question common to the class. Taken a step further, one can posit the issues of overrepresentation and/or misclassification as common to all black students in the State of Georgia because of the disparate impact of these alleged practices shown in plaintiff's statistical analysis. The possible reasons for the result shown by the statistics are myriad. However, plaintiffs submit that the only reason which explains the whole result is intentional racial discrimination. Whether defendants have acted against the class of black public school students in their classroom assignment policies because of their race is the issue remaining for trial. It cannot be resolved on a motion for class certification, no matter the quantity of evidence offered in opposition to said motion.

Defendants argue that commonality is not present because classroom placement is made on an individual, student-by-student basis. Defendants further submit the procedures used for regular classroom placement and EMR placement are totally distinct and comparisons between the two are not valid. This assertion is born out in the numerous reports and documents submitted by both sides showing test results, psychologists reports, etc. on the named plaintiffs and others. However, it is well settled that the requirement of common questions does not mean identical questions. *Johnson v. American Credit Co. of Georgia,* 581 F.2d 526, 532 (5th Cir.1978). Thus, a diversity of factual circumstances underlying individual class members' claims is irrelevant for purposes of the commonality requirement as long as there are questions of law or fact common to the class. *Resnick v. American Dental Association,* 90 F.R.D. 530 (D.C.Ill.1981). In the instant case, the issue is not how the tests were administered, nor what tests were administered. The issue is

whether, in spite of all the tests that were administered and guidelines that were followed, black children were placed in classrooms in the defendant districts solely because of their race. I find that the requirement of commonality has been satisfied.

### 3. Typicality and Adequacy of Representation

■ Rule 23(a)(3) provides that a class action may be maintained only if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Wright & Miller, *Federal Practice and Procedure: Civil* § 1764. Thus, the typicality prerequisite requires a comparison of the representatives' claims with the general claims of the proposed class. *Midwest Community Council v. Chicago Park Dist.*, 87 F.R.D. 457, 460 (N.D.Ill. 1981). This provision has traditionally been treated rather summarily by the courts because of the overlap between it and the requirements of commonality and adequacy of representation. Professor Miller has noted:

> [I]n the case of subdivision (a)(3), there does not seem to be *any* function it performs that is not to be accomplished by some other portion of that Rule. Subdivision (a)(3) insists that the representatives have typical claims or defenses. But if the plaintiffs are class members (an implied requirement), and there are common questions (Rule 23(a)(2)), and the class is adequately represented (Rule 23(a)(4)), it is very, very difficult to identify anything that is added by "typicality." The other prerequisites will insure "typicality" among the class members' claims or defenses.[8]

Rule 23(a)(4), on the other hand, requires a showing that the representative parties will fairly and adequately protect the interests of the class. Because of the volume of information which has been sifted through in order to make a determination on this issue, I will address the typicality requirement and certain aspects of the adequacy of representation requirement in tandem.

This approach will allow examination of the alleged "nexus" between the claims of the named plaintiffs and the class. In addition, the characteristics of the named plaintiffs and their ability to represent the class will be discussed.

■ Before turning to the discussion of the named plaintiffs, a review of the 23(a)(4) criteria is appropriate. Rule 23(a)(4) does not require that the class representative be the best of all representatives, but one who will pursue a resolution of the controversy in the interests of the class. *Dura-Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 101 (S.D.N.Y.1981). The adequacy requirement pertains to the quality of the class representatives, not the quantity. Wright and Miller, *Federal Practice and Procedure: Civil* § 1766. In evaluating the adequacy requirement, two basic guidelines have emerged: (1) the absence of a potential conflict between the named plaintiffs and the absent class members and (2) that the party's attorney be qualified, experienced and generally able to conduct the proposed litigation. *Dura-Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 100–101 (S.D.N.Y.1981), *citing Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 562 (2nd Cir. 1968), *vacated and remanded on other grounds*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). The court in *Dura-Bilt* also noted:

> It is in the nature of motion practice on class action determination issues that defendants, who naturally have no interest in the successful prosecution of the class suit against them, are called upon to interpose arguments in opposition to class determination motions verbally grounded upon a concern for the 'best' representation for the class, while the implicit, but nonetheless real objective of their vigorous legal assault is to insure 'no' representation for the class.

89 F.R.D. 87, 101 (S.D.N.Y.1981).

In addition to the two factors previously enumerated, a third factor analogous to that of typicality is important here. This

---

**8.** Miller, *Overview*, p. 26.

third factor, shared or common interests, is essentially the obverse of potential conflict between class members. It has been stated that the class representatives' and class members' interests must be coextensive; however, identical interests are not necessary. *Edmondson v. Simon,* 86 F.R.D. 375 (N.D.Ill.1980). Since a demonstration of the common factors that exist is more easily accomplished than an enumeration of factors that are nonexistent, I will now proceed to describe the named plaintiffs and the claims and class they seek to represent. For clarity, the named plaintiffs will be discussed by defendant district.

### Americus City School District

Phalisa S., by her next friend, Hazel Sims, is the named plaintiff from the Americus City School District. Phalisa is deaf and her school has recommended that she be placed in the Georgia School for the Deaf. Her mother had not consented to this placement at the time of her deposition on September 15, 1982. In October, 1982, Phalisa was in a reading class that had 21 black and 4 white children, and a math class with 21 black and 7 white children. The percentage of black students in these classes was 85 per cent and 75 per cent, respectively. In 1980, Americus' student population was 55 per cent black.

### Burke County

Sean L. and Michelle L., through their next friend, Mary Laurant, are the named plaintiffs in Burke County. In the 1976–77 school year, Sean's kindergarten class was 100 per cent black. In that same year, Michelle's fifth grade class had 28 students, six of whom were white or a class that was 79 per cent black. During the 1978–79 school year, Sean's second grade class was again composed of all black students. In the 1979–80 school year, Michelle's eighth grade language usage class was composed of 28 students. Four of these students were white while 24 were black. In 1979–80, Michelle's general math class consisted of 11 students. All of her classmates were black. In the 1981–82 school year, Sean's math class contained 17 students. Two students were white while the remainder of the class was black. The same ratio of black and white students was present in Sean's 1981–82 language arts class.

### Coweta County

Tina D., through her next friend, Sylvia Dennis, is one of the named plaintiffs in Coweta County. Tina was placed in developmental first grade in 1978–79. Her class contained 26 students, 15 or 60% of whom were black. In 1978, Coweta County's school population was 36.8% black. During the 1979–80 and 1980–81 school years, Tina was placed in EMR classes at the Atkinson Elementary School. In 1980, one of Tina's EMR classes was 67% black. During that same year, Tina was placed in another EMR class which contained 14 students. The race of 2 students was not indicated. Of the remaining twelve students, seven were black and five were white. During the 1981–82 school year, Tina was placed in an EMR class which contained eight black students and five white students (62% black). Tina's current EMR class (for the 1982–83 school year) is 61% black. The Coweta school district was 34.9% black in 1980.

Crystal D., through her next friend, Sylvia Dennis, is another named plaintiff from the Coweta County School district. Although Crystal has not been placed in EMR classes, she was placed in a developmental first grade class in 1979–80 and then promoted to a regular first grade. She has been regularly promoted since that time. Mrs. Dennis expressed a concern that, although both of her children are receiving A's and B's in their classes, a diploma would not be awarded them on graduation from high school because they had not learned the requisite material to pass the exit exam.

The class rosters of the remaining named plaintiffs from Coweta County were not available. However, none of the remaining plaintiffs from Coweta County have been classified as EMR. In lieu of the actual ratios of classroom placement, the OCR statistics for Coweta County have been used

by plaintiffs to demonstrate their class characteristics. The following is a synopsis:

In 1976, Kathis B. attended Arnco Sargeant School, which at that time was 20% black. The math classes that Arnco Sargeant reported to OCR that year had the following percentages of black students: 12, 12.5, 18.8, 22.2, 29.2, 29.6, and 71.4. That same year plaintiffs Willie and Anita W. attended Northside Elementary School, which was 33.5% black. The English classes at Northside had the following percentages of black students in 1976: 6.9, 12.9, 26.1, 29, 33.3, and 56 per cent black.

In 1978, Anita and Willie W. were in fourth grade at Arnco Sargeant School in Coweta County. Arnco Sargeant was 19.4% black at that time. Only one fourth grade class was reported to OCR and it had no black students. This same year, Rodney W. was in developmental first grade at Northside Elementary, which was 33.3% black. Only one self-contained first grade class was reported and it was 57.9% black. The first grade math classes were 18.5, 23.3, and 62.5 per cent black. While that school was 30.7% black in 1978, OCR statistics show that the first grade classes were 40.7% and 55.6% black.

In 1980, Willie W. attended the fifth grade at Arnco Sargeant. The school was 17.9% black that year, but the two reported fifth grade English classes were 3.4% and 17.4% black. Ronald W. was in a third grade class at Eastside Elementary in 1980. The only third grade math class reported was 40% black, although the school was only 28.5% black. Rodney W. attended Northside Elementary in 1980. He was in second grade and the school was 33.3% black. However, the two second grade math classes reported that year were 21.4% and 42.9%.

## Crisp County

Joseph P., through his next friend, Rosa Towns, is the named plaintiff in Crisp County. He entered first grade in the 1975–76 school year. In 1976–77, he attended J.S. Pate School, which plaintiff's statistics show was 51 per cent black in 1976 and 52.5 per cent black in 1978. However, during the 1976–77 school year, Joseph was in a regular classroom in which 16 out of the 20 students were black or a ratio of 80 per cent. In 1981, Joseph was placed in an EMR class which contained 18 students, 16 of whom were black (88%). The school he attended was 51% black in 1980.

## Evans County

Rhonda Smith is a named plaintiff in the Evans County School District. Evans County's student population was 45.6% black in 1978 and 45.7% black in 1980. In 1981–82, Rhonda's seventh grade class had 22 black students out of a total of 33 students (67% black).

Kimble Smith is also a named plaintiff in the Evans County School District. In 1979–80, Kimble was enrolled in two first grade classes which had 22 and 20 black students out of a total of 34 and 33, respectively (65% and 60%). In 1980–81, Kimble's second class had 20 black students out of a total of 32 (63% black).

Robert Smith is another named plaintiff in the Evans County School District. In 1979–80, Robert's fifth grade class had 25 black students out of a total of 36 students (69% black). In 1980–81, Robert's sixth grade class had 21 black students out of a total of 32 students (66% black). For the 1981–82 school year, Robert was enrolled in a seventh grade class which had 22 blacks out of a total of 32 (67% blacks).

## Jefferson County

Gregory G., by his next friend, Liza Gross, is the named plaintiff in Jefferson County. He entered the first grade at Louisville Academy in the fall of 1973. With the exception of his third grade class in 1975–76, every math and language arts class in which Gregory was placed was composed of all black students. In 1976, the student population at Louisville Academy was 73 per cent black; in 1978, it was 71 per cent black; and in 1980, the school population was 76 per cent black.

## Lee County

Plaintiff Esker C. is a named plaintiff from Lee County. In 1973–74, Esker's first grade math and language arts class contained 18 black and 8 white students (69% black). Black students composed 48.6% of the school population of Lee County in 1972. His second grade class was 60% black, with 15 black students and 10 white students (one student's race is unknown). In 1975–76, his third grade class contained 25 black and 9 white students (73% black) while in 1976–77 Esker's fourth grade class had 17 black and 7 white students (70% black). In 1976, black students composed 36.3% of the Lee County school population. In the 1977–78 school year, Esker's fifth grade class had 18 black students and 6 white students (75% black), while his sixth grade class in 1978–79 contained 20 black and 10 white students (66% black). In 1978, black students composed 32.9% of school population in Lee County.

Frank C., Esker's brother, is also a Lee County plaintiff. Frank entered first grade during the 1980–81 school year and his reading and math class had 12 black and 14 white students with the race of 2 students unknown (46% black). His second grade reading and math classes were composed of 11 black and 13 white students (45% black). The percentage of black students in the school population for 1980 was not available.

## Liberty County

The table below shows the percentage of black students in each third grade class of the Bacon Primary School in 1972, each self-contained elementary school class in 1976, and each first grade class in 1978. Bacon Primary was 50.8% black in 1972, 41.4% black in 1976, and 41.8% black in 1978. (No data were available for 1980).

| % Blacks in 3rd grade in 1972 | % Blacks in el. ed. in 1976 | % Blacks in 1st grade in 1978 |
| --- | --- | --- |
| 3 | 3 | 18 |
| 26 | 4 | 56 |
| 44 | 14 | 56 |
| 50 | 32 | 56 |

| % Blacks in 3rd grade in 1972 | % Blacks in el. ed. in 1976 | % Blacks in 1st grade in 1978 |
| --- | --- | --- |
| 52 | 35 | 87 |
| 53 | 37 | |
| 77 | 44 | |
| 85 | 46 | |
| | 48 | |
| | 50 | |
| | 63 | |
| | 87 | |

## Miller County

Tina B., through her next friend, Mary Ann Butler, is a plaintiff from Miller County. Tina began school in 1976 in a kindergarten class which had 23 black students and 2 white students, which translates into a class which was 92 per cent black. Her first grade class in 1977–78 was 97 per cent black, with 34 black children and 1 white child. Her second grade class was 64% black while her third grade class was 72% black. In the 1980–81 school year, Tina's class had 20 black and 9 white students. She started the 1980–81 school year in a class with 16 black and 9 white students or a class which was 64% black. However, in October, 1981, she was transferred to an EMR class which contained 14 black and 2 white students. Since the institution of this lawsuit, Tina has been removed by her mother from EMR classes. In 1976, the Miller County School District was 43.1 per cent black; 40.1 per cent black in 1978; and 39.8 per cent black in 1980.

Ultricia T., by her next friend, Anthony Thompson, is another named plaintiff from Miller County. Her kindergarten class in 1979–80 contained 25 black and 10 white students or was 71% black. In 1981–82, her second grade class had 21 black students out of a total of 31 students or was 67 per cent black. In the 1982–83 school year, Ultricia's class is 60 per cent black, with 18 black and 12 white students.

## Pelham City School District

Lola W. is a named plaintiff from Pelham. In 1972–73, she attended first grade and her class had 28 black students out of a total of 30 students (93%). In 1972, the Pelham school system was 57% black. In 1973–74, Lola apparently repeated the first

grade. Her class was all black. In the 1974–75 and 1975–76 school years, Lola was in EMR classes which were again all black. In 1976, the student population of Pelham was 59% black. In 1976–77, Lola's EMR class contained 11 black students and 1 white student. Lola's fourth grade class, which is not indicated as being EMR in 1978–79, was composed of 15 black students and 4 white students (84% black). In 1978, the Pelham school system was 57% black. Her 1979–80 fifth grade class, also not indicated as an EMR class, had 19 black students, 1 Hispanic student, and 2 white students (86% black). In 1980, the student population of Pelham was 58% black. In 1980–81, Lola was in an EMR class which contained 24 black students and 1 Hispanic student. In 1981–82, she was placed in an EMR class with 20 black and 2 white students.

Julia W., Lola's sister, also attends public school in Pelham. When Julia was in second grade during the 1976–77 school year, her math and reading classes were composed of 24 black students, 2 Hispanic students and 1 white student (88% black). In the 1978–79 school year, when Julia was in third grade, her math and reading classes included 23 black students, 1 white student, and 1 student whose race is unknown (approximately 92% black). During the 1981–82 school year, Julia's math and reading classes were composed of 17 black students and 2 white students (89% black). Her school, South Elementary, had a black population of 61% in 1976, 61% in 1978, and 60% in 1980.

### Vidalia City School District

Bridgett M. is a named plaintiff in the Vidalia School District. Black students constituted the following percentage of the student population in Vidalia: 40.6% in 1972, 42.4% in 1976, 40.7% in 1978, and 41.6% in 1980. In 1981–82, one of Bridgett's fourth grade reading classes had 21 black students and 1 Hispanic student out of a known racially identifiable total of 31 students (68%), or a total minority percentage of 70%. For the present school year,

1982–83, Bridgett is enrolled in a language arts class which has 15 black students out of a total of 24 students (62.5%). She is also enrolled in a math class this school year which has 28 black students out of a total of 38 (74%).

Michael Rozier is also a named plaintiff in the Vidalia School District. In 1976–77, his first grade class had 17 black students out of a total of 25 students (68% black). In the second grade, 1977–78, Michael's class had 22 black students out of a total of 32 students (69%). In the third grade, 1978–79, Michael's class had 21 black students out of 24 students (88%). For the 1980–81 school year, Michael's fourth grade math class had 22 black students out of a total of 29 students (76% black). His reading class for the same year had 19 black students out of a known identifiable total of 29 (66% black). In the fifth grade, 1981–82, Michael was enrolled in language arts classes which had 21 and 24 black students out of a total of 32 and 37, respectively (66% and 65% black). In the same year, Michael was enrolled in a math class which had 21 black students out of a total of 27 (78% black). In the 1982–83 academic year, Michael is in a reading class which has 20 black students out of a total of 29 (69% black).

Clifford Bagley is a named plaintiff in the Vidalia School District. In 1980–81, Clifford was enrolled in a reading class which had 23 black students out of a total of 33 students (70%). During the 1981–82 academic year, Clifford's fifth grade language arts class had 21 black students out of a total of 32 students (66% black).

Jerry Rozier is a named plaintiff in the Vidalia School District. In 1980–81, he was in first grade and his class had 23 black students out of a total of 29 students (79% black). Jerry's second grade class had 20 black students out of a total of 26 students (77% black). For the current academic year, Jerry is enrolled in a language arts class with 27 black and 5 white students (84% black). His math class is composed of 28 black and 5 white students (85% black).

Percy M. is another named plaintiff from the Vidalia School District. Through an oversight by plaintiff's counsel, Percy's records were not obtained from the defendants. Percy entered kindergarten in the Vidalia school system in the 1976–77 academic year and has remained in the system at least through the fifth grade. He has been promoted each year. The analysis of the racial composition of Percy's classes is not available and will need to be provided to the Court before he can be certified as a class representative.

The foregoing survey does not present a complete picture, in that every class attended by every plaintiff was not catalogued. However, the discovery allowed by this Court prior to this motion being filed was directed toward class certification. The Court does not view a motion for class certification as the time for a mini-trial on the merits, especially in light of the discovery limitations placed on the plaintiffs up to the time of the December hearing. And the Court reminds the defendants that the limitations on plaintiff's discovery were imposed at their behest. All of the information provided the Court by way of affidavit, etc. urging that a class not be certified is certainly relevant—in a trial on the merits. The plaintiffs' burden at this juncture was to establish that a class existed. It is my opinion that this burden has been met.

 In every defendant district, there appears to be a disparity in the racial composition of the classes in which the plaintiffs have been placed. This disproportionality has occurred in both regular classrooms and in the EMR placements. The named plaintiffs are all black. This factor alone combined with allegations of discrimination will not define a class. However, the plaintiffs have demonstrated that their allegations of discrimination have some basis in fact although certainly this observation may be negated at the trial of the merits. The claims of the class representatives are typical of those of the putative class, unlike the *Falcon* situation which involved applicants and employees. In the instant case, the representatives of the class all are black children in the public schools of Georgia who are presently attending classes in the defendant districts. Their claim is simply that black students, such as themselves, are overrepresented in certain types of regular classrooms and in EMR classrooms. And although the varying methods used for placement by each defendant district are relevant to the merits, their existence does not defeat a class certification motion. The problems presented in *Falcon, i.e.,* that the class claims were not fairly encompassed by the named plaintiff's claims, are not evident here.

Another component of Rule 23(a)(4) involves an inquiry into the adequacy of representation which will be provided for the plaintiff class. Professor Miller has noted that an analysis of the adequacy of counsel is perhaps the "most abrasive and difficult aspect of the Rule 23(a)(4) analysis for a district judge."[9] A preeminent factor in the determination is the attorney's experience in handling litigation of the type involved in the case. Other factors include the attorney's motivation, competence, support personnel, and other professional commitments.

 In the case, four attorneys employed by the Georgia Legal Services Program represent the individual plaintiffs.[10] A fifth attorney is representing the NAACP. Each of the five attorneys representing the plaintiffs in the instant case have substantial experience in federal civil rights litigation, as is evidenced by the affidavits submitted by these counsel in support of the motion for class certification. Plaintiffs' counsel have vigorously, if not zealously, prosecuted the pending action which has included extensive discovery on the issue of class certification. Moreover,

**9.** Miller, *Overview,* p. 35.

**10.** Since the institution of this action, one of the GLSP attorneys has entered private practice. However, he has not withdrawn as counsel.

Georgia Legal Services Programs, Inc. has earmarked $114,000 for the prosecution of this action. Attorneys provided by a legal services organization are not rendered incompetent under Rule 23(a)(4) simply because their employer advances the costs of litigation without expecting reimbursement if unsuccessful. *Wolkenstein v. Reville,* 539 F.Supp. 87, 91 (W.D.N.Y.1982); *Brame v. Ray Bills Finance Corp.,* 85 F.R.D. 568, 575–78 (N.D.N.Y.1979); *see also Holland v. Steele,* 92 F.R.D. 58, 64 (N.D.Ga.1981); *Aguirre v. Bustos,* 89 F.R.D. 645 (D.C.N.M. 1981) (Facts that the named plaintiffs were uneducated laborers and that they were poor did not mean that they were inadequate class representatives on the theory that they lacked the knowledge necessary to control the lawsuit, when they had firsthand knowledge of the conditions that gave rise to the suit, or on the theory that they could not adequately finance the action, when the legal services organization had set aside the funds necessary to conduct the suit). Counsel for plaintiffs have shown a willingness to commit the time, energy and money necessary to litigate this case, and this Court considers them competent to do so.

■ Various defendants have also submitted that the named plaintiffs do not have a sufficient understanding of the purpose of the lawsuit to adequately represent the unnamed class members. In this regard, it should be noted that the matter of the adequacy of the class representative is not a legal question, but a factual inquiry, the resolution of which depends on all the facts and circumstances of a particular case and is entrusted to the discretion of the trial court. *Dudo v. Schaffer,* 93 F.R.D. 524, 531–32 (E.D.Pa.1982); *McGowan v. Faulkner Concrete Pipe Co.,* 659 F.2d 554, 559 (5th Cir.1981). While the depositions of the named plaintiffs and their representatives are not the best examples of individuals schooled in sophisticated use of the English language or legal lexicon; such skills are not crucial in determining adequacy of representation. The plaintiffs provided a factual basis to counsel for the instigation of an investigation and lawsuit. Their

knowledge of the facts was sufficient to allow attorneys for Legal Services to frame a claim for relief. *See Dura-Bilt Corp. v. Chase Manhattan Corp.,* 89 F.R.D. 87, 102 (S.D.N.Y.1981), *quoting Chevalier v. Baird Savings Association,* 72 F.R.D. 140, 146 (E.D.Pa.1976):

> There is no doubt that the named plaintiffs have a very sketchy view of what this litigation is all about. We also do not doubt that counsel are proceeding in this case without significant restraints from the named plaintiffs. Nevertheless, we cannot agree that this thereby renders a class action inappropriate.

Similarly, in the instant case, plaintiffs, have given their attorneys unfettered discretion in the prosecution of this lawsuit. However, plaintiffs have also, in their own fashion, expressed the desire to see that the wrong allegedly done to them is not done to others. *Deary v. Guardian Loan Co.,* 534 F.Supp. 1178, 1190 (S.D.N.Y.1982). Moreover, the plaintiffs have made themselves available for depositions and have been, for the most part, cooperative and responsive to the best of their ability. Such behavior is especially probative of plaintiffs' willingness to see the case through when some plaintiffs have preferred to withdraw rather than be so inconvenienced. The plaintiffs who remain in the instant action are adequate representatives of the class whose interests are in turn being competently represented by counsel for plaintiffs.

■ The final element of Rule 23(a)(4) is that there must not be conflicting or antagonistic interests between the class representatives and those they seek to represent. In this regard, it is well-settled that only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status. Wright & Miller, *Federal Practice and Procedure: Civil* § 1768. Rather, an intraclass conflict will justify a finding that the plaintiff is an inadequate representative in only two instances. The class members either must have an interest for which judicial awareness provides no protection or the

plaintiffs' representation must be so incomplete that the Court cannot adjust the litigation structure to get a clear view of the class' interests. *Gill v. Monroe County Dept. of Social Services,* 79 F.R.D. 316, 327 (W.D.N.Y.1978).

Neither of these situations exist in the instant case. The class members, as black children in Georgia's public schools, have an interest in seeing all vestiges of racial discrimination eliminated from their schools and classrooms. Defendants assert that a possible intra-class conflict exists on behalf of black children who have been placed in majority white classrooms. Defendants have submitted that these black children have an interest in maintaining the *status quo* which is contrary to the interests of the class. This assertion is, at this point, without merit. First, it is merely speculative. *See Morgan v. Laborers Pension Trust Fund for No. California,* 81 F.R.D. 669, 680 (N.D.Cal.1979) (Speculation or conjecture that conflict might exist between plaintiffs seeking to represent the putative class, unsupported by reasoned analysis or underlying evidence, should not preclude the court from finding that plaintiffs' representation is adequate). Moreover, defendants' argument presumes that there is something inherently beneficial in being in a "white" class. If this is true, then this lawsuit is not frivolous for one of the goals of the original desegregation orders was provision of equal educational opportunities for black and white children in a desegregated school and classroom. Furthermore, if plaintiffs are successful on the merits of this action and the Court is called upon to fashion relief, the parties can be assured that this Court will not order any plan which would penalize the black child who is currently placed in a "white" classroom for the proper reasons. I cannot imagine that such a result was ever intended by the plaintiffs in instituting this lawsuit. As one defendant stated, the benefit accrues when a child is placed at his or her appropriate educational level. The achievement of a racially balanced school system should not sound the death knell for educational integrity in the public schools.

### The State and Liberty County NAACP as Class Representatives

The Court is aware that the purpose of this organization is to eliminate racial discrimination in any form. It follows that the NAACP has an interest in eliminating any vestiges of segregation in education. And out of the many members of the NAACP across the State, this Court is certain that many members have had children who attended or currently attend public school in the State. However, without more, the NAACP cannot be a member or part of the class possessing the same interests and suffering the same injury as the putative class members. There is a vast difference between the "interest and injury" of the named plaintiffs previously discussed and those which can be posited for either the State or Liberty County NAACP. And the Court has found it impossible to apply the requisite tests of Rule 23 to these organizations in order to qualify them as class representatives. *See Vulcan Society v. Fire Dept. of City of White Plains,* 82 F.R.D. 379 (S.D.N.Y.1979).

### The Final Step in Certification; Rule 23(b)(2)

Rule 23(b)(2) provides that a class action is appropriate when "the party opposing the class has acted or refused to act on grounds generally applicable to the class," and the representatives are seeking "final injunctive relief or corresponding declaratory relief." Wright & Miller, *Federal Practice and Procedure: Civil* § 1775. The fact that there is a factual dispute concerning whether the requirement that defendant acted on grounds generally applicable to the class is satisfied will not bar relief. *Id., citing Dickerson v. United States Steel Corporation,* 64 F.R.D. 351, 358 (E.D.Pa. 1974); *Paxman v. Campbell,* 612 F.2d 848, 854 (4th Cir.1980). Furthermore, all the class members need not be aggrieved by or desire to challenge the defendant's conduct in order for one or more of them to seek relief under Rule 23(b)(2). What is neces-

sary is that the challenged conduct or lack of conduct be premised on a ground that is applicable to the entire class. *Edmondson v. Simon,* 86 F.R.D. 375, 383 (N.D.Ill.1980), *citing* Wright & Miller, *Federal Practice and Procedure: Civil* § 1775; *Davis v. Weir,* 497 F.2d 139, 146 (5th Cir.1974).

 The allegations of the instant action fit within this rubric. The plaintiffs are complaining of a common course of conduct in that they allege that the local school districts have engaged in intentional racial discrimination in the placement of black students in regular and EMR classes throughout the State, but especially in the defendant districts. Defendants also failed, through inaction, to fulfill its affirmative obligation to eliminate intentional racial discrimination in the public schools. The first requirement of Rule 23(b)(2) is therefore met. The second requirement of Rule 23(b)(2) has also been satisfied because plaintiffs seek only injunctive and declaratory relief. Therefore, this action comes within Rule 23(b)(2).

### Conclusion

1. The Court finds that the named plaintiffs enumerated on pages 31–43 (excluding the NAACP) of this Order to be proper class representatives with the following exceptions:
 a) Crystal D.—Coweta
 b) Kathis B.—Coweta
 c) Willie and Anita W.—Coweta
 d) Rodney W.—Coweta
 e) Ronald W.—Coweta
 f) Percy M.—Vidalia

Before the six individuals enumerated as (a)–(f) above will be certified as class representatives, the Court must be provided with information on the racial proportions of the classes in which they have been enrolled.

2. The Court further finds that the named plaintiffs are proper class representatives on the following claims:
 a) the class representatives may raise both claims against the State on behalf of all black children in the State of Georgia;

b) the class representatives may raise each claim against each local defendant on behalf of the black children in the respective school system;

3. This certification is conditional. In the event of changed circumstances of any representative, the parties are under a duty to notify the Court immediately.

4. The Court had earlier indicated that this case would come to trial in May, 1983. This date now appears to be impossible. The parties will be notified when a new trial time is set.