**DISABLED IN ACTION OF BALTIMORE; Gary Kritzer; John A. Coffin; Dawn McKawl; Bearl Reuter, Individually and on behalf of those similarly situated**

v.

**Lowell K. BRIDWELL, Secretary, Maryland Department of Transportation; David A. Wagner, Administrator, Mass Transit Administration; Andrew L. Lewis, Jr., Secretary, United States Department of Transportation; Peter N. Stowell, Regional Representative, Urban Mass Transportation Administration—Region Three, Individually and in their official capacities.**

Civ. A. No. M–81–2979.

United States District Court,
D. Maryland.

Sept. 25, 1984.

Richard T. Bolan, Baltimore, Md., for plaintiff Disabled in Action of Baltimore.

Gary Kritzer, John A. Coffin, Dawn McKawl and Bearl Reuter, pro se.

Joseph S. Kaufman, Kenneth D. Pack, and Melnicove, Kaufman, Weiner & Smouse, P.A., Baltimore, Md., for defendants Lowell K. Bridwell, Secretary, Maryland Department of Transportation, and David A. Wagner, Administrator, Mass Transit Admin.

J. Frederick Motz, U.S. Atty., for Maryland, James C. Savage, Asst. U.S. Atty., Baltimore, Md., and Trudy B. Levy, Asst. Chief Counsel, Michael S. Bates, Attorney-Advisor, Urban Mass Transportation Administration, Washington, D.C., for defendants Andrew L. Lewis, Jr., Secretary, U.S. Dept. of Transp., and Peter N. Stowell, Regional Representative, Urban Mass Transp. Admin.—Region Three.

## MEMORANDUM AND ORDER

JAMES R. MILLER, Jr., District Judge.

The plaintiffs in this case, Disabled in Action of Baltimore, Gary Kritzer, John A. Coffin, Dawn McKawl, and Bearl Reuter, in their complaint, as amended, named as defendants Lowell K. Bridwell, Secretary of the Maryland Department of Transportation, David A. Wagner, Administrator of the Maryland Mass Transit Administration (MTA), (hereinafter referred to as the "state defendants"), Andrew L. Lewis, Jr., Secretary of the United States Department of Transportation (DOT), and Peter N. Stowell, Regional Representative of the Urban

Mass Transportation Administration (UMTA) for Region Three, (hereinafter referred to as the "federal defendants"), in their individual and official capacities.

## I. *Procedural Background*

On November 19, 1981, this action was initiated by the plaintiffs who sought to enjoin the defendants from opening bids for the purchase of 81 new buses without a commitment from the defendant MTA to exercise an option to purchase all of the buses with wheelchair lifts. The original complaint alleged in Count I a violation of the Equal Protection Clause of the Fourteenth Amendment, in Count II a violation of Section 16 of the Urban Mass Transportation Act, 49 U.S.C. § 1612, in Count III a violation of § 504 of the Rehabilitation Act, 29 U.S.C. § 794, enforceable through 42 U.S.C. § 1983, and in Count IV a violation of Maryland state law (Paper No. 1). On that same date the plaintiffs' motion for a temporary restraining order was denied, and plaintiffs were given leave to amend their complaint.

The amended complaint subsequently filed retained the same four counts contained in the original complaint and requested preliminary and permanent injunctions to prevent the MTA from awarding the contract without exercising the wheelchair lift option for all of the 81 new buses (Paper No. 10).

Following consideration of the state defendants' Motions to Dismiss and for Reconsideration (Paper Nos. 15 & 24) and the federal defendants' Motion for Summary Judgment (Paper No. 16), this court (1) dismissed Count I except to the extent that it alleged a violation of § 504 of the Rehabilitation Action through 42 U.S.C. § 1983, (2) dismissed Count II except to the extent that it sought judicial review under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, of the defendants' actions in connection with the "special efforts" certification pursuant to the Urban Mass Transportation Administration's 1981 interim regulations, 46 Fed.Reg. 37,488 (1981), (3) denied the defendants' motion to dismiss Count III, the pure § 504 Count, and (4)

dismissed Count IV, the state claim count (Paper Nos. 21 & 26).

On December 24, 1981, this court denied the plaintiffs' Motion for a Preliminary Injunction, finding that the "likelihood of success on the merits for the plaintiffs is small" (Paper No. 23).

When, on January 8, 1982, MTA Administrator David A. Wagner announced that 40 of the 81 new buses to be purchased would be equipped with wheelchair lifts, the plaintiffs filed a Motion for an Award of Interim Attorney's Fees. This motion was denied following a hearing on May 7, 1982, after the court found that the decision to equip 40 of the new buses with lifts was the result of a long planning process conducted by the MTA and that there was no causal relationship between this lawsuit and the MTA's decision to purchase those lift-equipped buses (Paper No. 38).

Discovery thereafter proceeded in this case as scheduled. On July 22, 1983, counsel for the plaintiffs moved to withdraw their appearance because of the plaintiffs' lack of assistance and cooperation in undertaking discovery (Paper No. 58). On July 25, 1983, leave to withdraw was granted and the individual plaintiffs were notified that they should inform the Clerk of this court whether new counsel would represent them or whether they would proceed *pro se* (Paper No. 58). Individual plaintiffs Reuter and McKawl informed the court that they would proceed *pro se* (Paper Nos. 65 & 66).

The next day, the state defendants filed a Motion for Summary Judgment (Paper No. 59) and the federal defendants filed a Motion for Summary Judgment shortly thereafter (Paper No. 61). New counsel for Disabled in Action filed a Request for a Status Conference (Paper No. 63), to which the state defendants responded (Paper No. 64). Disabled in Action also filed a Motion to Dismiss without Prejudice and a Motion for a Continuance until this court considered the Motion to Dismiss (Paper Nos. 68 & 67). All defendants opposed the Motion to Dismiss without Prejudice (Paper Nos. 70 & 71), and, on September 15, 1983,

the plaintiff's Motion to Dismiss was denied (Paper No. 68). New counsel for Disabled in Action were given additional time to respond to the summary judgment motions (Paper No. 69). The court granted Disabled in Action's new counsel leave to review the discovery in this case (Paper No. 72).[1] In accordance with the schedule, Disabled in Action filed a Motion for Summary Judgment or Opposition to Defendants' Motions (Paper No. 73). Individual plaintiffs, Reuter and McKawl, joined in the motions filed by Disabled in Action (Paper No. 74). All defendants filed their replies to the plaintiffs' Opposition (Paper No. 75 & 84).

In October, 1983, Disabled in Action filed a Motion for Discovery pursuant to Rule 56(f) (Paper No. 78), a Motion for Extension of Time for Submission of Affidavits and Documents (Paper No. 85), and a Motion to Reopen Discovery (Paper No. 79). The state and federal defendants opposed these motions (Paper Nos. 76 & 82).

The state and federal defendants filed Motions to Quash the subpoenas duces tecum served on their respective records custodians (Paper Nos. 81 & 83), to which Disabled in Action replied (Paper No. 77).

This court held a hearing on the pending motions. On June 11, 1984, counsel for Disabled in Action filed an additional affidavit in support of its motion (Paper No. 86). After reviewing the papers submitted and the arguments of counsel on the motions reviewed at the hearing and the pending motions for summary judgment, the motions pending in this case are hereby resolved as set forth below.

## II. *Class Certification*

Section (a) of Rule 23 establishes the following four prerequisites to the maintenance of any class action: (1) the putative class must be so numerous as to make joinder of all members impracticable; (2) there must be questions of law or fact common to the class; (3) the claims of the representative parties concerning the is-

sues must be typical of the class; and (4) there must be assurance that the named plaintiffs will adequately pursue and protect the interests of the class. *Twyman v. Rockville Housing Auth.*, 99 F.R.D. 314, 319 (D.Md.1983). *See Chisholm v. United States Postal Service*, 665 F.2d 482, 493 (4th Cir.1981).

■ In determining whether the named plaintiffs in this case would be adequate class representatives, courts look to two criteria—(1) the representatives must have common interests with the unnamed members of the class; and (2) it must appear that the representatives will vigorously prosecute the interest of the class. *Twyman*, 99 F.R.D. at 322–23; *M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*, 100 F.R.D. 468, 470–71 (D.Mass.1984); *Allen v. Isaac*, 99 F.R.D. 45, 55–56 (N.D.Ill.1983); *Brotherhood Railway Carmen v. Delpro Co.*, 98 F.R.D. 471, 476 (D.Del.1983). *See generally* 7 C. Wright & A. Miller, *Federal Practice & Procedure* § 1766 (1972); 5 H. Newberg, *Class Actions* § 8818, at 8856 (1977).

■ Whether named representatives are adequate and will vigorously prosecute the interest of the class is a determination which depends on the facts of each case. *United Independent Flight Officers, Inc. v. United Air Lines, Inc.*, 572 F.Supp. 1494, 1499–1500 (N.D.Ill.1983). While mere speculation of inadequacy is insufficient, *Wilkinson v. FBI*, 99 F.R.D. 148, 160 (C.D.Cal.1983), the importance of the adequacy requirement cannot be stressed too strongly, because a judgment in a Rule 23(b)(2) class action will bind the absent class members. The class representatives must voluntarily accept a fiduciary obligation towards all the members of the putative class, *Shelton v. Pargo, Inc.*, 582 F.2d 1298, 1305 (4th Cir.1978), and must have a sufficient interest in the issues being presented on behalf of the class. *Wagner*

---

1. At the same time this order was submitted, Disabled in Action's counsel filed a Motion requesting this court to set forth its reasons for denying plaintiff's Motion to Dismiss without

Prejudice. Those reasons are adequately set forth in the defendants' opposition to the Motion to Dismiss.

*v. Central Louisiana Electric Co.,* 99 F.R.D. 279, 284–85 (E.D.La.1983).

■ The requirement of vigorous prosecution on the part of the named representatives is tested by an examination of the manner in which they have pursued a resolution of the case. *See, e.g., Twyman,* 99 F.R.D. at 323; *Runion v. U.S. Shelter,* 98 F.R.D. 313, 318 (D.S.C.1983). Whether the plaintiffs have aided counsel in discovery is "especially probative of plaintiffs' willingness to see the case through" and to be adequate representatives. *Georgia State Conference of Branches of NAACP v. State of Georgia,* 99 F.R.D. 16, 35 (S.D.Ga. 1983).

■ In the present .case, the court has determined that the vigorous prosecution requirement of Rule 23(a) has not been met by the named plaintiffs. As the Motion to Withdraw of prior counsel for the plaintiffs indicates, apparent disagreement existed between prior counsel and the class representatives, and the class representatives failed to cooperate in pursuing discovery. Accordingly, this court concludes that the class identified by the plaintiffs in their complaint, as amended, shall not be certified.

### III. *Discovery Motions*

■ The plaintiffs' Motion to Reopen Discovery (Paper No. 79), Motion for Discovery pursuant to Rule 56(f) (Paper No. 78), and Motion for Extension of Time for Submission of Affidavits and Documents (Paper No. 85) are denied. The Motions to Quash filed by the state and federal defendants are granted (Paper Nos. 81 & 83). Ample time was allowed for discovery in this case during the almost two years it had been pending in this court. Furthermore, as the defendants indicated at the October, 1983 hearing, most of the discovery sought by new counsel was repetitive. In addition, Disabled in Action has recently submitted additional support for its pending motion by way of affidavit, thereby rendering the Motion for Extension of Time moot. For these reasons this court concludes that sufficient discovery

time was originally permitted and additional discovery would only further delay this case with little or no additional information to be gained.

### IV. *Summary Judgment Motions*

#### A. *Statutory and Regulatory History*

The plaintiffs' principal claim against the state defendants in this suit is that MTA's failure to equip its bus fleet with wheelchair lifts, instead of operating the present Mobility program, violates their rights under § 504 of the Rehabilitation Act, as amended, 29 U.S.C. § 794. Section 504 provides in relevant part:

"No otherwise qualified handicapped individual in the United States, as defined in Section 706(7) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service."

29 U.S.C. § 794 (1984 Supp.).

The essence of the claims against the federal defendants is that they have approved transit grants to the local defendants when they knew or should have known that those defendants had failed to make satisfactory "special efforts," as required by statute, to provide accessible transportation to the handicapped. Federal assistance to states and localities for mass transit is generally provided under the Urban Mass Transportation Act of 1964, as amended (the "UMT Act"). In 1970, Congress passed § 16 of the UMT Act, which declared it to be national policy that elderly and handicapped persons have the same right as others to utilize mass transportation and that special efforts shall be made in planning and designing such facilities for effective utilization by these two groups. 49 U.S.C. § 1612(a).

The Federal Aid Highway Act of 1973, as amended in 1974, provides that transportation projects funded under that Act must

be planned and constructed to allow effective utilization by, among others, the non-ambulatory wheelchairbound. Furthermore, the Secretary was instructed not to approve any program not complying with the provisions of that Act. 23 U.S.C. § 142 note (1976). *See Dopico v. Goldschmidt*, 518 F.Supp. 1161, 1166–67 (S.D.N.Y.1981), *aff'd in part, rev'd in part*, 687 F.2d 644 (2d Cir.1982).

In 1976, UMTA adopted regulations to implement those statutes. The regulations, which became effective in 1976, became known as the "special efforts" regulations. *See* 49 C.F.R. Parts 609 & 613, 41 Fed.Reg. 18234 (Apr. 30, 1976). These regulations required the creation of a Metropolitan Planning Organization ("MPO"), which was to be responsible "for carrying out the urban transportation planning process ... [and which] shall develop the planning work programs, transportation plan, and improvement program ... [and] shall be the forum for cooperative decisionmaking by principal elected officials." 23 C.F.R. § 450.112(a). The program developed by the MPO must include satisfactory "special efforts" in planning public mass transit facilities so that they can effectively be used by the elderly and the handicapped. 23 C.F.R. § 120(a)(5). Thus, the 1976 regulations permitted local determination of the particular approach to be used but required certain levels of service for the elderly and handicapped.

The 1976 regulations set forth alternative means by which the "special efforts" requirement would be met. The Appendix to the 1976 regulations set forth three examples of "special efforts." One means of compliance would be to provide a program for wheelchair users and semiambulatory persons involving annual average expenditures equivalent to a minimum of 5% of an urbanized area's Section 5 apportionment. Another example of "special efforts" would be to purchase only wheelchair accessible, fixed route vehicles until one-half of the fleet was accessible, or to develop a substitute to provide comparable coverage. The final alternative would be the provision of a system which would assure every

wheelchair user or semiambulatory person transportation for 10 round trips per week at prices comparable to those charged for standard service. 41 Fed.Reg. 18234.

The second set of regulations, promulgated in 1979, were necessitated when President Ford directed the then Department of Health, Education and Welfare to establish guidelines for all agencies in implementing § 504 of the Rehabilitation Act of 1973. Executive Order No. 11,914, 41 Fed.Reg. 17,871 (1976). *See* 43 Fed.Reg. 2132 (1978), 45 C.F.R. §§ 85.1–85.58 (1980). These HEW guidelines required that "all recipients of federal funds 'mainstream' handicapped persons, that is integrate such persons into the same programs available to others, rather than treat them as a separate group in 'special' programs." *American Public Transit Ass'n (APTA) v. Lewis*, 655 F.2d 1272, 1275 (D.C.Cir.1981). Under these guidelines, separate treatment could be accorded only when necessary to ensure equal opportunities. *See* 43 Fed.Reg. at 2134.

In the context of public transportation, "mainstreaming" meant that the mode of transportation in a transit system had to be accessible to the handicapped. *See* 43 Fed. Reg. at 2138–39, 45 C.F.R. §§ 85.56, 85.57. The 1976 DOT regulations violated this requirement, and, therefore, in 1979, DOT promulgated a new regulation which required, *inter alia*, that new fixed route buses be accessible to handicapped persons. 44 Fed.Reg. 31442, 31477–91 (May 31, 1979), 49 C.F.R. §§ 27.81–27.107 (1980).

In *APTA*, 655 F.2d 1272, the Court of Appeals for the District of Columbia invalidated the new 1979 regulation, concluding that the 1979 regulation exceeded DOT's authority to enforce § 504 of the Rehabilitation Act.

As a result of the *APTA* decision, DOT issued new regulations on July 21, 1981, superseding the 1979 set. *See* 46 Fed.Reg. 37488 (1981), 49 C.F.R. § 27.77 (1981). These regulations, currently in effect, require a return essentially to the 1976 model, requiring "special efforts" toward pro-

viding transportation usable by the handicapped, rather than "mainstreaming" or achieving a goal of accessibility by a certain date. *Dopico*, 687 F.2d at 648.

The 1981 regulations, like the 1976 regulations, include an advisory Appendix which provides virtually the same examples of acceptable levels of "special efforts."

With regard to the present case, Appendix A of the 1981 regulations provides in pertinent part:

"UMTA will not specify a program design to meet the 'special efforts' requirement. However, the following examples are illustrative of a level of effort that will be deemed to satisfy this requirement with respect to wheelchair users and semiambulatory persons:

1. A program for wheelchair users and semiambulatory handicapped persons that will involve the expenditure of an average annual dollar amount equivalent to a minimum of 3.5 percent of the financial assistance that the urbanized area receives under section 5 of the UMT Act ... These '3.5 percent funds' may be derived from sources other than section 5. The term 'average' permits lower expenditure years to be balanced by high expenditure years but does not permit an initial delay in implementing projects. Projects that qualify as local 'special efforts' for wheelchair users and other semiambulatory persons under the initial paragraphs of this advisory information would be counted in computing the 3.5 percent."

46 Fed.Reg. 37493, 49 C.F.R. § 27.77 (1981).

### B. *MTA Facilities*

On May 30, 1978, MTA began operation of the Mobility program (Paper No. 59, Ex. 3). As described in the MTA's mobility brochure:

"Mobility is a specialized public transportation service in Baltimore for persons *who cannot use the regular transit buses because of disabilities.* Specially equipped buses, smaller than regular transit buses, but fitted with low steps, grab rails, wheelchair lift, wheelchair positions and comfortably designated seats, serve the patrons."

*Id.* Exh. 1 (Emphasis in original). To register for Mobility, the applicant must complete the application in the Mobility brochure and send it and the accompanying Physician's Statement to Mobility. *Id.* The applicant's physician must certify that the applicant suffers a disability which renders him or her unable to ride regular MTA buses and provide the reason for that inability. *Id.* At the end of June, 1983, there were 5,036 Mobility registrants. *Id.* Exh. 2, Affidavit of Ronald J. Hartman.

Also operating as a part of the Mobility program since July, 1982, is the Pilot Taxi Program. Through a contract with the Sun Cab Company, private taxicabs instead of vans are employed to provide transportation for those who are registered with Mobility. *Id.* Transportation in the Mobility program is provided within the Baltimore Beltway. To request a trip on Mobility, the registrant must call the Mobility dispatch office to request the intended trip at least 48 hours prior to the time of the trip. Regular ride service, trips made at least one time each week on the same days and to the same destination, is also provided. As of June, 1983, 1,633 regular ride trips were provided weekly and 47 one-way trips were on the regular ride waiting list. *Id.*

As indicated by Exhibit 3 to the state defendants' Motion for Summary Judgment, the MTA has spent in excess of 3.5 percent of its financial assistance under UMT Act on the Mobility program for every year beginning with 1979, the first full year of Mobility's operation (Paper No. 59, Exh. 3). In fiscal year 1983, MTA's operating expenditure for the Mobility program totalled $1,004,774 of UMT Act total operating subsidy of $10,752,102, or 9.3 percent. From 1979 to 1982, respectively, the total operating expense of Mobility was 3.9, 4.4, 5.7 and 6.4 percent. Each year was in excess of the minimum in the example of "special efforts" provided in the Appendix to the 1981 regulations.

In addition to the Mobility Program, the MTA provides limited accessibility to the fixed bus route by employing in the bus fleet of 900 use of 40 lift-equipped buses on five bus routes and 182 buses with a kneeling feature (Paper No. 59, Exh. 1, ¶ 9). Finally, the MTA has begun operation of an eight mile rapid rail service, the Baltimore Metro. Each station has elevators and other features to aid travel by disabled people. *Id.* ¶ 11.

In reliance on the oral ruling on a discovery motion in this case when this court ruled that the term "wheelchair users and semiambulatory handicapped persons" as used in Appendix A to the 1981 regulations "means people who are transportationally unable to use regular public transportation,"[2] the defendants have moved for summary judgment because the Mobility expenditures alone surpass the 3.5% requirement in Appendix A (Paper No. 59).

The plaintiffs contend that summary judgment should not be granted, because the legislative history of § 504 of the Rehabilitation Act of 1973 and the judicial interpretation of this statute imposes affirmative obligations on federally assisted mass transit systems which can be fulfilled through "mainstreaming." In addition, the plaintiffs contend that this court must look beyond the UMT Act 1981 regulations, because these regulations, they say, did not comply with the rulemaking requirements and otherwise do not deserve deference by this court. The plaintiffs assert that the law requires equivalent service to handicapped persons through complete access to the fixed bus service rather than through continued use of Mobility.

C. *Validity of and Deference to the 1981 Regulations*

The First Circuit has noted that when discussing the requirement imposed by § 504, "the relevant federal agency, not the court, has the chief responsibility to identify those instances where a refusal to accommodate the needs of a disabled person amounts to discrimination—and to determine any necessary affirmative steps." *Rhode Island Handicapped Action Comm. v. Rhode Island Public Transit Auth.*, 718 F.2d 490, 496–97 (1st Cir.1983), *citing, Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979). *See Consolidated Rail Corp. v. Darrone*, —— U.S. ——, 104 S.Ct. 1248, 1251, 79 L.Ed.2d 568 (1984); *Community Television of Southern California v. Gottfried*, 459 U.S. 498, 103 S.Ct. 885, 889, 74 L.Ed.2d 705 (1983) (federal agencies have the responsibility of enforcing and

**2.** During the course of discovery, a dispute arose concerning the meaning of the phrase "wheelchair users and semiambulatory handicapped persons" as used in Appendix A to Section 27.77 of Subpart D of Title 49 of the Code of Federal Regulations. Appendix A provides that the "special efforts" requirement of § 27.77 would be satisfied by "a program for wheelchair users and semiambulatory handicapped persons that will involve the expenditure of an average annual dollar amount equivalent to a minimum of 3.5 percent of the financial assistance that the urbanized area receives under section 5 of the UMT Act." But the regulations do not define "semiambulatory handicapped persons."

On March 4, 1983, by oral ruling on a discovery motion, this court stated that the term "wheelchair users and semiambulatory handicapped persons" as used in Appendix A meant those who were unable to use regular public transportation. The reasons for the court's ruling were also expressed as follows:

"I think the purpose of the regulation was to implement the intention of the Statute, and the intention of the Statute was not to give some advantage to different types of handicapped people. 'Semiambulatory handicapped persons' is an attempt, in my judgment, to, in effect, help those who are unable to use ordinary public transportation, and it is not an attempt to classify—it was supposed to be a broad term, everybody, in effect, and what you are trying to do is slice it out and say: It includes just this little group here, the ones on wheelchairs and the ones who can't walk. Well, I disagree. I don't think that is what it was intended to be. I think it was intended to be a broad category and not a limited category."

To the extent that the plaintiffs seek to limit the category of qualifying expenditures to those on behalf only of those handicapped individuals who need aid with walking (Paper No. 73 at 7) this court continues to disagree. The purpose of the statute would not be effectuated by such a limitation and, as the proposed regulations indicate, the use of paratransit transportation should be available to those who have difficulty using public transportation. *See* 48 Fed.Reg. 40686 (September 8, 1983).

interpreting § 504 of the Rehabilitation Act of 1973). *See also Nelson v. Thornburgh,* 567 F.Supp. 369, 379 (E.D.Pa.1983) (and cases cited therein).

In discussing the validity of, and deference to be given, the 1981 regulations, the First Circuit stated:

"The district court held that the 'unusual' history of regulations promulgated under § 504 demonstrates that the current regulation does not deserve deference. 549 F.Supp. at 609 n. 5. We disagree. The kind of distance from the statute and inconsistency of interpretation that justifies giving an agency interpretation of a statute no deference is not present in this case. Agencies may alter their interpretations of statutes from time to time. *Chisholm v. FCC,* 538 F.2d 349 (D.C.Cir.), *cert. denied,* 429 U.S. 890, 97 S.Ct. 247, 50 L.Ed.2d 173 (1976). *See Public Interest Research Group v. FCC,* 522 F.2d 1060, 1066 (1st Cir.1975), *cert. denied,* 424 U.S. 965, 96 S.Ct. 1458, 47 L.Ed.2d 731 (1976). In point of fact, the current 1981 regulation is substantially identical to the original 1976 DOT regulations promulgated after notice and comment under the Administrative Procedure Act, 5 U.S.C. §§ 500 *et seq.* Section 504 was enacted in 1973; and while the original 1976 regulation was thus not exactly a contemporaneous construction, neither was it at any great distance in time. No agency issued regulations interpreting § 504 prior to 1976. *See Cherry v. Mathews,* 419 F.Supp. 922 (1976).

To be sure, in 1979 DOT adopted the comprehensive regulation struck down in *Lewis,* 655 F.2d 1272. But DOT adopted the 1979 regulation in order to comply with guidelines issued by HEW, not because it necessarily doubted its original assessment of the meaning of § 504 contained in the 1976 regulation. (The court in *Lewis* observed that '[i]f the HEW Secretary had not implemented guidelines enforcing section 504 inconsistent with DOT's 1976 regulations, it is quite possible the latter would still be in effect.' 655 F.2d at 1279.) Significantly,

even the 1979 regulation, like the 1976 and present one, specifies that compliance with § 504 can be effected by spending a fixed percentage of § 5 funds on 'special efforts' for the handicapped. The 1976 regulation called for a 5 percent spending level and the 1979 regulation called for a 2 percent spending level. The current figure of 3.5 percent is said to result in approximately the same level of spending on special efforts as was achieved under the old 5 percent figure. 46 Fed.Reg. at 37489.

We can see no reason to treat the present DOT regulation with less than normal deference."

*Rhode Island Handicapped Action Comm.,* 718 F.2d at 497 n. 10.

■ Under the APA procedures, DOT was not required to follow notice and comment procedures under 5 U.S.C. § 553(d) when,

"(1) a substantive rule which grants or recognizes an exemption or relieves a restriction; ... or

(3) as otherwise provided by the agency for good cause found and published with the rule."

DOT specifically complied with these statutory exceptions under § 553(d) when it published the 1981 regulations. *See* 46 Fed. Reg. 37488 (July 20, 1981).

In its preamble to the 1981 regulations DOT stated that it was necessary to adopt a regulation without notice and comment period, making the regulations effective immediately, because (1) the replacement of the 1979 regulation, requiring all buses be accessible, with the 1981 regulation, giving grant recipients a local option to determine which "special efforts" to make, "relieved a restriction," and (2) the *APTA* decision "abruptly and significantly removed a major legal premise" for the 1979 regulation, and thus DOT had good cause "to act expeditiously to conform its regulation to the understanding of the law resulting from the [*APTA*] decision." 46 Fed.Reg. 37488, 37491 (July 20, 1981). In addition, as DOT also noted, the 1981 regulations were nec-

essary to provide guidance to grant recipients following the *APTA* decision to avoid confusion among recipients. *See Buckeye Cablevision, Inc. v. United States*, 438 F.2d 948 (6th Cir.1971) (interim rule issued without notice and comment upheld to provide effective interim procedure pending conclusion of the rule making proceedings).

For the reasons set forth above, this court concludes that the 1981 regulations are valid and are to be accorded due deference in resolving the present motions.

### D. *Requirements of § 504 of the Rehabilitation Act of 1973*

Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794 (1984 Supp.), guarantees to handicapped individuals the right to participate in, and receive the benefits of, any program or activity receiving federal financial assistance. *Hessler v. State Board of Education of Maryland*, 700 F.2d 134, 137 (4th Cir.1983). The general and broad language of § 504 has caused ambiguity and confusion over the scope and effect of § 504 since its enactment. *Rhode Island Handicapped Action Comm.*, 718 F.2d at 494. *See also Rhode Island Handicapped Action Comm. v. Rhode Island Public Transit Auth.*, 549 F.Supp. 592, 607 (D.R.I.1982).

Analysis of § 504 of the Rehabilitation Act of 1973 begins with the Supreme Court's opinion in *Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979). In *Davis*, a severely hearing-impaired individual sought admission to an associate degree program leading to eligibility for certification as a registered nurse. The college denied her admission on the ground that her inability to understand speech without reliance on lipreading rendered her unqualified for the nursing program. The district court determined that this inability would prevent her functioning safely in Southeastern's program and concluded that Davis was not an "otherwise qualified handicapped individual" within the meaning of section 504. The Court of Appeals for the Fourth Circuit vacated this part of the decision on appeal. In a unanimous decision, the Supreme Court reversed.

Justice Powell, writing for the Court, declared that section 504 imposed no obligation to make substantial modifications because the statute made no reference to affirmative action. *Id.* at 410–11, 99 S.Ct. at 2369. While the line between a lawful refusal to extend affirmative action and illegal discrimination against handicapped persons was recognized by the Court as not always a clear one, major adjustments of programs simply to accommodate handicapped persons were not required to be imposed under § 504. *Id.* at 412–13, 99 S.Ct. at 2370.

In subsequent cases, the Supreme Court and the lower courts have acknowledged that in *Davis* the Supreme Court has concluded that the "Rehabilitation Act requires the evenhanded treatment of the handicapped, rather than 'affirmative efforts to overcome the disabilities caused by handicaps.'" *Davis*, 442 U.S. at 410, 99 S.Ct. at 2369 (1979), *quoted in, Disabled in Action v. Mayor & City Council of Baltimore*, 685 F.2d 881, 885 n. 3 (4th Cir.1982). *See also Smith v. Robinson*, —— U.S. ——, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984); *United States v. University Hospital*, 729 F.2d 144, 160 (2d Cir.1984); *Wilder v. City of New York*, 568 F.Supp. 1132, 1136 (E.D.N.Y.1983).

The plaintiffs contend that the Court in *Davis* was not rendering a sweeping declaration of the scope of § 504 but rather that it limited the impact of its holding regarding § 504's scope to the facts of the particular case involving clinical programs for professional schools (Paper No. 72, at 10). Courts which have addressed § 504's requirements for transportation systems, however, have accorded the teachings of *Davis* applicability in the transportation context as well. *See APTA*, 655 F.2d 1272; *Dopico*, 687 F.2d 644; *Michigan Paralyzed Veterans of America v. Coleman*, 545 F.Supp. 245, 251 (E.D.Mi.1982).

■ While this court recognizes that the primary goal of the passage of § 504 was to "assist handicapped individuals in

achieving their full potential for participation in our society," 119 Cong.Rec. 24,589 (July 18, 1973) (comments of Senator Dole), this court cannot conclude from this and other generalized statements made during the passage of this legislation that the manner in which localities will achieve equal opportunities for the handicapped in their transportation programs must be by instituting full accessibility to the mass transportation facilities used by the general public.

While massive changes in the status quo solely to accommodate the handicapped are not required by § 504, this does not mean that affirmative steps are never required to be taken to meet the needs of the handicapped. It is a question of degree. Courts considering § 504 have concluded that "modest, affirmative steps" to accommodate the handicapped in public transportation can be required. *Dopico*, 687 F.2d at 652 (and cases cited therein). As the *Davis* Court recognized, "on occasion the elimination of discrimination might involve some costs." *Davis*, 442 U.S. at 411 n. 10, 99 S.Ct. at 2369 n. 10, *quoted in, Nelson*, 567 F.Supp. at 381.

The relief requested by the plaintiffs in this case, accessibility to the public transportation system used by the general public, or "mainstreaming," exceeds the scope of the relief which can be required under § 504. As Judge Mikva noted for the D.C. Circuit Court of Appeals in 1981, § 504 did not mandate extensive modifications on every new bus or subway car, regardless of cost, but instead mandated modest expenditures. Accordingly, the 1979 regulations requiring "mainstreaming" could not be supported by the authority of § 504. *APTA*, 665 F.2d 1272. *See Lloyd v. Illinois Regional Transp. Auth.*, 548 F.Supp. 575, 584 (N.D.Ill.1982) (full accessibility of all buses, rapid transit facilities, and fixed facilities to the handicapped exceeds the scope of § 504 because such a requirement is unduly burdensome).

The capital cost of fitting new buses with wheelchair lifts for the MTA is not insubstantial, amounting to approximately $8,500 each according to plaintiffs. *See* Paper No. 73, Reuter Affidavit ¶ 25. This cost, even accounting for the federal government 80% subsidy for capital costs, is not insubstantial. The cost of retrofitting the 678 MTA buses which presently have neither the kneeling feature nor the lifts presumably would be at least $8,500 per bus or $5,743,000. *Id.* ¶¶ 14–25.

More importantly, however, as the courts which have addressed this controversy have stated, the determination of what special efforts are required is a complicated question. *Rhode Island Handicapped Action Comm.*, 718 F.2d at 497–98. The problem was outlined by the court in *Atlantis Community, Inc. v. Adams*, 453 F.Supp. 825 (D.Col.1978), as follows:

"How plain is the language of § 16(a) of the UMT Act and § 504 of the Rehabilitation Act? What must be done to provide handicapped persons with the same right to utilize mass transportation facilities as other persons? Does each bus have to have special capacity? Must each seat on each bus be removable? Must the bus routes be changed to provide stops at all hospitals, therapy centers and nursing homes? Is it required that buses be able to accommodate bedridden persons? Is it discriminatory to answer any of these questions in the negative? Will the operation of hydraulic lifts on buses involve stigmatizing effects on the persons who use them? If so, is that a discrimination solely by reason of handicap within the meaning of § 504?"

*Adams*, 453 F.Supp. at 831. There is an ongoing dispute among experts over whether fixed route buses will attract sufficient numbers of mobility impaired riders to make such improvement preferable to alternative options, such as paratransit. *Rhode Island Handicapped Action Comm.*, 718 F.2d at 496. Neither is it clear that full accessibility to fixed route buses would provide equal opportunity for all handicapped or meet the needs of all in need of transportation.

Not surprisingly then, courts have sought guidance from the agencies which administer these statutory directives. *Rhode Island Handicapped Action Comm.,* 718 F.2d at 497–98 (primary guidance on whether the requirements of § 504 are met come from the regulations promulgated by the federal agency responsible for overseeing the federal funds); *Dopico,* 687 F.2d at 65 (case remanded for fashioning of relief under the "special efforts" requirements that Congress had legislated and as the regulations specified); *Nelson,* 567 F.Supp. at 381.

As previously outlined in this Memorandum, the defendants have expended more than the amount required under the 1981 regulations to provide public transportation to the handicapped community. Each year since the Mobility program has been in place, more than 3.5 percent of UMT Act § 5 funds have been expended in meeting the transportation needs of the handicapped. In addition, limited accessibility is available to the MTA's bus and subway systems. The fulfillment of the "special efforts" requirement outlined in the 1981 regulations by the MTA leads this court to conclude that full accessibility sought by the plaintiffs is not required by the regulations nor by § 504 itself.

The affidavits submitted by the plaintiffs in support of their motion for summary judgment do not alter this conclusion. The fact that fixed route bus accessibility for some individuals may be preferable or of greater assistance to them is not sufficient to compel the conclusion that discrimination under § 504 has occurred. No one program will benefit all of the handicapped in the manner each would like. In short, the MTA has met the "special efforts" requirements as outlined in one of the examples contained in the Appendix to the 1981 regulations through its Mobility program alone.[3] In addition, the MTA has provided some limited accessibility over and above the paratransit Mobility Program. For these reasons, the court concludes that summary judgment should be granted for all defendants on all counts.[4]

Accordingly, it is this 25th day of September, 1984, by the United States District Court for the District of Maryland, ORDERED:

1. That the Motions for Summary Judgment filed by the state and federal defendants (Paper Nos. 59 & 61) be, and the same are hereby, GRANTED.

2. That the class certification in this case be, and the same is hereby, DENIED for the reasons set forth in this Order.

3. That the plaintiffs' Motion for Discovery (Paper No. 78), Motion to Reopen Discovery (Paper No. 79), Motion for Extension of Time for Submission of Affidavits and Documents (Paper No. 85), and Motion for Summary Judgment or Opposition to Defendants' Motions (Paper No. 73) be, and the same are hereby, DENIED.

4. That the Motions to Quash filed by the defendants (Paper Nos. 81 & 83) be, and the same are hereby, GRANTED.

5. That the Clerk mail a copy of this Memorandum and Order to counsel for the defendants, to counsel for Disabled in Action, and to the individual plaintiffs.

---

3. The plaintiffs suggest that a question of fact exists, prohibiting the granting of summary judgment, because of the need for additional discovery or the questionable character of the costs of the Mobility program. Additional discovery, as previously noted, is no longer available and no basis for questioning the calculations concerning the expenditure for Mobility is presented.

4. The plaintiffs suggest that summary judgment cannot be granted for the federal defendants due to the lack of a record necessary to determine whether they should have withheld certification because of the local defendants' failure to make satisfactory "special efforts." *Lloyd,* 548 F.Supp. at 590. Since in the present case, unlike in *Lloyd,* it is clear that the appropriate percentage of federal funds was used for providing transportation to the handicapped, further review of the "complete" record reviewed by the federal defendants is unnecessary.