**AMERICANS DISABLED FOR ACCESSIBLE PUBLIC TRANSPORTATION (ADAPT) et al. and Eastern Paralyzed Veterans Association (EPVA) et al.**

v.

**Elizabeth H. DOLE.**

**Civ. A. No. 86–2989.**

United States District Court,
E.D. Pennsylvania.

Jan. 4, 1988.

Thomas K. Gilhool, Timothy M. Cook, Andrew Erba, Stephen F. Gold, Philadelphia, Pa., James D. Fornari, Richard M. Zuckerman, Jarblum, Solomon & Fornari, P.C., New York City, for plaintiffs.

Peter Greenberg, Philadelphia, Pa., for Eastern Paralyzed Vet. Assoc. of Penna. Inc. & James J. Peters.

Raymond M. Larizza, Dept. of Justice, Civ. Div., Washington, D.C., Barbara Koppa Geralamo, Asst. U.S. Atty., U.S. Attorney's Office, Philadelphia, Pa., for defendant.

## MEMORANDUM

KATZ, District Judge.

Plaintiffs, on behalf of the disabled, attack regulations which purport to carry out legislation protecting the rights of the handicapped and elderly to public transportation services. The regulations create a 3% cost cap as a safe harbor, regardless of the level of service provided by transit authorities to the disabled. I find this 3% formula as well as the inclusion of the cost of a "half-fare" program in the calculation of the 3% spending cap to be arbitrary. The six year phase-in period of the regulations, however, is reasonable. In addition,

I find that Congress has not yet legislated mainstreaming for the disabled in public transportation.

Americans Disabled for Accessible Public Transportation (ADAPT), et al. and Eastern Paralyzed Veterans Association (EPVA), et al. have filed respectively, a motion for summary judgment and a motion for partial summary judgment, seeking to invalidate portions of regulations (the "regulations") promulgated by the Secretary (the "Secretary") of the United States Department of Transportation ("DOT"), on the bases that the Secretary's 1986 regulations fail to provide to disabled persons all of the services and rights that they have been granted by federal disability civil rights statutes and that the regulations arbitrarily limit the obligations of transit operators who receive federal funds to provide transportation services to the handicapped. Defendant has filed a cross-motion for summary judgment.

## STATUTORY AND REGULATORY BACKGROUND

In 1983 Congress passed § 317(c) of the Surface Transportation Assistance Act of 1982 ("STAA"), (49 U.S.C. § 1612(d)), directing the Secretary of DOT to promulgate final regulations establishing "minimum criteria for the provision of transportation services to handicapped and elderly individuals by recipients of Federal financial assistance." 49 U.S.C. § 1612(d).

These regulations were to carry out, pursuant to § 317(c), three earlier Congressional directives concerning the rights of the elderly and handicapped to use public transportation. First, in § 16(a) of the Urban Mass Transportation Act of 1964, as amended (49 U.S.C. § 1612(a)), Congress enunciated a national policy that:

> elderly and handicapped persons have the same right as other persons to utilize mass transportation facilities and services; that special efforts shall be made in the planning and design of mass transportation facilities and services so that the availability to elderly and handicapped persons of mass transportation

which they can effectively utilize will be assured; and that all Federal programs offering assistance in the field of mass transportation (including the programs under this Act) should contain provisions implementing this policy.

49 U.S.C. § 1612(a). Secondly, in § 165(b) of the Federal-Aid Highway Act of 1973, (23 U.S.C. § 142), Congress directed that: "[t]he Secretary of Transportation shall assure that projects receiving Federal financial assistance ... shall be planned and designed so that mass transportation facilities and services can effectively be utilized by elderly and handicapped persons." 23 U.S.C. § 142. Thirdly, § 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794) provides that:

> No otherwise qualified handicapped individual in the United States ... shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

29 U.S.C. § 794.

The regulations, promulgated by the Secretary in 1986, provide for a local option approach which permits local transit authorities to comply with the above legislation in any one of three ways: either by using accessible buses (operating on fixed routes on a scheduled or on-call basis), using a "special service" with accessible vehicles providing door to door service, or by combining accessible fixed route service with special service. Local transit authorities may elect which of these three methods to use, but the service that they provide must meet each of six specified criteria. 49 C.F.R. § 27.97 (1986).

The service must meet the following six criteria: [1]

(1) all persons who, by reason of handicap, are physically unable to use the recipient's bus service for the general public must be eligible to use the service for handicapped persons;

---

1. The regulations formulate variations of the application of these six criteria for each of the three available options the recipient may select. 49 C.F.R. § 27.95 (1986).

(2) service must be provided to a handicapped person within 24 hours of a request for service;

(3) restrictions or priorities based on trip purpose are prohibited;

(4) fares must be comparable to fares charged the general public for the same or a similar trip;

(5) the service for handicapped persons must operate throughout the same days and hours as the service for the general public; and

(6) the service for handicapped persons must be available throughout the same service area as the service for the general public.

49 C.F.R. § 27.95 (1986).

To meet the service criteria, a recipient is required to spend no more than 3% of the average total annual operating costs it reasonably expects to incur in the current fiscal year and did incur during the previous two fiscal years. 49 C.F.R. § 27.97(a) (1986). In addition, the costs of "half-fare" discounts offered by local transit authorities to elderly and handicapped individuals are permitted to be included as part of the local transit authority's calculations in determining its satisfaction of the 3% cost cap. If the service criteria cannot be met without exceeding that limit, a local transit agency may, after consultation through its public participation process, and after DOT's approval, modify its services to reduce expenditures to the maximum level required. 49 C.F.R. § 27.97(a) (1986). Each recipient must prepare a program which will ensure the provision of services at the full performance level as soon as reasonably feasible, but in any case within six years of the date of DOT approval of the program. 49 C.F.R. § 27.95(a) (1986).

The program employed by any particular local transit authority must be developed through a public participation process which includes consultation with handicapped persons and their representatives regarding "the need for service to handicapped persons in the area served by the recipient, any weaknesses or problems in present service or plans for service, and types and characteristics of service to be provided under the recipient's program." 49 C.F.R. § 27.83 (1986). All interested persons must be provided with information pertinent to the development of the program, including cost estimates, and a minimum 60 day period for public comment on the program as well as at least one public hearing during the comment period is mandated. 49 C.F.R. § 27.83 (1986). The recipient "shall make efforts to accommodate, but is not required to adopt, significant comments" made by the public on its proposed programs, but must make a public response to the comments, explaining its reasons for not accommodating significant comments. 49 C.F.R. § 27.83(c) (1986).

The local transit authority must then submit the final program to DOT for its review and approval. 49 C.F.R. § 27.85 (1986). This submission must include "[d]ocumentation of the projected costs of implementing the recipient's program, the costs of alternatives considered by the recipient, the projected amounts of the limitation on required expenditures for the recipient, and the rationale for any reduction of service quality below a level meeting fully the [applicable] service criteria." 49 C.F.R. § 27.85(a)(3) (1986). DOT may either approve or disapprove the plan as submitted or may condition approval on the adoption of specified modifications to the plan. The agency must however complete its review of the program within 120 days of its submission, unless DOT determines that additional time is required and notifies the recipient transit authority of reasons for the review period. 49 C.F.R. § 27.85(a), and § 27.85(c) (1986).

Plaintiffs' contentions regarding the regulations, are as follows:

A) Congress has mandated, in the legislation discussed above, that handicapped persons' transportation be mainstreamed into the public transportation systems, thus providing integrated settings for transit; as the Secretary's 1986 regulations do not mandate such mainstreaming they are violative of these statutes.

B) The Secretary's cost considerations and cost limit are impermissible under the

relevant statutes, and are arbitrary and capricious.

C) The inclusion of the expense of the "half-fare" policy for service for the handicapped in the 3% cost limit is arbitrary and capricious.

D) The six year maximum phase-in period for local transit authorities to meet the minimum service criteria is arbitrary and capricious.

## DISCUSSION

### Mainstreaming

At the heart of the concept of mainstreaming is the notion that transportation services to handicapped persons be provided on the same vehicles that are used to carry members of the general public. In reviewing the legislation, its history, and past regulations, I am unable to find a Congressional mandate to mainstream handicapped persons' transportation in either § 504, § 16(a) or § 165(b). Congress has not yet legislated equality for the handicapped regardless of cost.

In 1979 DOT promulgated regulations that attempted to implement the concept of mainstreaming. 44 Fed.Reg. 31,442 (1979). These regulations, requiring that any local transit systems receiving any federal funds make all modes of transportation accessible to the handicapped, were challenged by the American Public Transit Association ("APTA") and were found to be beyond DOT's statutory authority. In *APTA v. Lewis*, 655 F.2d 1272 (D.C.Cir.1981), the

Court of Appeals for the District of Columbia Circuit held that such affirmative steps were not necessary to comply with § 504, and indeed, that by requiring full accessibility and its attendant heavy financial burdens DOT had exceeded its authority under the statute. 655 F.2d at 1278 (D.C.Cir. 1981). Similarly, in *Disabled in Action of Baltimore v. Bridwell*, 593 F.Supp. 1241 (D.Md.1984) the Court noted that "accessibility to the public transportation system used by the general public, or 'mainstreaming', exceeds the scope of relief which can be required under § 504," 593 F.Supp. at 1251 (D.Md.1984).[2]

In 1981 new regulations were promulgated by DOT which embodied a local option approach rather than an attempt to mandate mainstreaming. 46 Fed.Reg. 37,-488; 49 C.F.R. § 27.77 (1981). In *Rhode Island Handicapped Action Committee v. Rhode Island Public Transit Authority*, (RIPTA), 718 F.2d 490 (1st Cir.1983) the First Circuit upheld under sections 16(a), 165(b) and 504 the local option approach embodied in the regulations and held that the District Court incorrectly had ordered RIPTA to expend monies beyond those required by the 1981 regulations. 718 F.2d at 497. *Accord, Bridwell*, 593 F.Supp. at 1246 (1984).[3]

Similarly, both the language and the legislative history of § 317(c) show that Congress had not yet resolved the question of whether public conveyances should be fully accessible to the handicapped when it

**2.** The Architectural Barriers Act of 1968, 42 U.S.C. §§ 4151–52 which requires that buildings financed with federal funds be accessible to the handicapped is inapplicable here as it purports to deal only with the accessibility of structures and not with the access of the disabled to public transportation. Similarly, Congress' 1970 amendment to the Act extending its applicability to subway stations and surface stations, in no way applied to personal property such as buses, subway cars or trains. 1970 U.S.Code Cong. and Adm.News, pp. 2475, 2476. In addition, plaintiff ADAPT's attempt to argue that the 1978 amendment to § 502 of the Rehabilitation Act mandates mainstreaming is incorrect. 29 U.S.C. § 792 created no authority for the enforcement of mainstreaming in public transportation, but only for enforcement of the Architectural Barriers Act. Indeed, the legislators who sponsored § 317(c) similarly did not interpret

either the Architectural Barriers Act or 29 U.S.C. § 792 to mandate mainstreaming in public transportation. *See* n. 4–7, and accompanying text, *infra*.

**3.** Plaintiff ADAPT cites *Vanko v. Finley*, 440 F.Supp. 656 (N.D. Ohio 1977) for the proposition that though in 1977 full accessibility of the handicapped to fixed route buses was not yet technologically feasible, mainstreaming would be required when the technology was finally developed. If, however, mainstreaming was not yet technologically possible in 1977 when *Vanko* was decided, it could not realistically have been mandated by the two earlier statutes on which plaintiff ADAPT relies, namely § 16(a) of the Urban Mass Transportation Act, promulgated in 1970 and § 165(b) of the Federal-Aid Highway Act promulgated in 1973.

passed § 317(c) in 1982. § 317(c) clearly provides that the service criteria promulgated by DOT regulations must be consistent with any applicable government-wide policy implementing § 504. 49 U.S.C. § 1612(d). At the time that § 317(c) was enacted into law mainstreaming was not the applicable government-wide policy. In force at that time rather were DOT's 1981 regulations which embraced a local option approach that allowed transit operators to choose to service their constituency with either accessible fixed route vehicles, a separate paratransit system or a combination of both. When § 317(c) was passed there were no applicable government-wide standards for implementing § 504 which provided solely for mainstreaming as the means of facilitating the use of public transit by handicapped individuals.

As the words of the statute itself undercut the notion that § 317(c) mandates mainstreaming, so to does the legislative history of that section. Senator Cranston, one of the statute's sponsors, stated that new legislation would be required to ensure full vehicle accessibility but that there was no possibility of such legislation gaining the approval of Congress.[4] Rather, Senator Cranston sought to "deal in a modest fashion with some of the major problems" experienced by handicapped individuals who use public transportation[5], while leaving "great flexibility to the Secretary of Transportation" to establish ways of meeting the needs of the disabled.[6] Senator Riegle's suggestion for service criteria applicable to separate paratransit systems shows a similar awareness that mainstreaming would not necessarily be the result of § 317(c).[7]

■ Similarly, on the facts before the agency, DOT's decision not to implement mainstreaming, but rather to allow local transit authorities to use either accessible buses, paratransit or mixed systems was reasonable.

Only if I find that the DOT's action was arbitrary and capricious, an abuse of discretion, can I hold agency action unlawful. 5 U.S.C. § 706(2)(A). The Supreme Court has stated that judicial review under this "standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 at 43, 103 S.Ct. 2856 at 2866, 77 L.Ed.2d 443 (1983). I must "consider whether the agency's decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."[8] 463 U.S. at 43, 103 S.Ct. at 2866–67 (1983). The data in the Regulatory Impact Analysis (RIA) prepared by DOT in connection with the rule making proceeding demonstrates that the demand for separate special services is far higher than it is for accessible mainline buses. Similarly, the data in the RIA reflects the fact that paratransit vehicles are more cost-effective than are lift-equipped buses, and that a separate system for the handicapped provides more service for the same dollars than does mainstreaming.[9]

Applying this deferential standard of review, I conclude that DOT's decision not to mandate mainstreaming, but rather to implement a local option policy which allows local communities to choose for themselves the type of service that they will provide to their handicapped constituents was supported on the record by evidence of the relative costs and benefits of alternate ser-

---

4. 128 Cong.Rec.S. 14740 (daily ed. Dec. 14, 1982).

5. 128 Cong.Rec.S. 14741 (daily ed. Dec. 14, 1982).

6. 128 Cong.Rec.S. 14741 (daily ed. Dec. 14, 1982).

7. 128 Cong.Rec.S. 15715 (daily ed. Dec. 20, 1982).

8. I agree with the defendant that the cases dealing with rescinding a rule are not applicable to

this case, since the recission of the mainstreaming only policy occurred well before the regulations in this case were issued. The *APTA v. Lewis* decision had underminded the policy in 1981; the local option policy adopted in the *1981* DOT regulations had been approved by the Department of Justice, and Congress has not legislated mainstreaming.

9. DOT, *Regulatory Impact Analysis*, pp. VI–7—VI–10.

vice modes, and was not a clear error of judgment.

*Cost Considerations and 3% Cost Limitation*

Neither the applicable statutes nor the legislative history of those laws requires that DOT ignore the financial burdens on local transit agencies nor do they restrict the agency's discretion to consider compliance costs as a factor. However, the 3% of operating expenses safe harbor cost limit is contrary to the intent of § 317(c) and is arbitrary and capricious.

■ Agencies, in regulating pursuant to § 504, may consider costs in determining what efforts institutions are to take to accommodate the handicapped. *See generally Southeastern Community College v. Davis,* 442 U.S. 397 at 411, 99 S.Ct. 2361 at 2369, 60 L.Ed.2d 980 (1979) (neither the language nor the purpose, nor the history of § 504 and the amendments thereto support an interpretation of that section as mandating burdensome affirmative action); *see also Alexander v. Choate,* 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985) (reaffirming *Southeastern Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979) as the proper starting point for any analysis of § 504, and acknowledging that a grantee need not be obligated to make "fundamental" or substantial modifications to accommodate the handicapped).

Nor can I find evidence that the two transportation assistance statutes, § 16(a) of the Urban Mass Transportation Act, 49 U.S.C. § 1612(a) (declaring a national policy that "special efforts" be made to provide mass transportation to the elderly and handicapped) and § 165(b) of the Federal-Aid Highway Act (providing that transportation projects funded under that Act be planned, designed, constructed and operated to permit effective utilization by disabled people), or the language or legislative history of § 317(c) preclude DOT from performing a cost-benefit analysis. Courts have approved the cost limit guideline in the 1981 DOT mass transit regulations based on these statutes. *See RIPTA,* 718 F.2d at 497 (1st Cir.1983); *Disabled in Action of Baltimore v. Bridwell,* 593 F.Supp. at 1247 (D.Md.1984).

Since in the language of these statutes no list of factors to be considered by the agency, nor language excluding factors from consideration, nor specifying the quality of service to be achieved is to be found, the Secretary has discretion to consider the cost of compliance with these regulations. *See generally Motor Vehicle Manufacturers Association of the United States, Inc.,* 463 U.S. 29 at 54–55, 103 S.Ct. 2856 at 2872–73, 77 L.Ed.2d 443 (1983) (National Highway Safety Administration correct to examine costs and benefits of equipping vehicles with passive restraints); *Professional Drivers Council v. Bureau of Motor Carrier Safety,* 706 F.2d 1216 at 1222 (D.C.Cir.1983) (permissible for federal agency to consider costs and benefits and to base its regulatory decisions on an economic impact assessment).

■ The 3% of operating expenses safe harbor cost limit, however, violates the mandate of § 317(c) and is unreasonable on the facts in the administrative record. Though the Secretary may properly take costs into account in determining how best to implement the federal disability civil rights statutes, she may not, through regulations implemented pursuant to § 317(c) abrogate entirely the rights granted by those statutes. DOT grantees may be permitted to take the least expensive or most cost effective route toward providing services to their disabled patrons, but those services must in fact be provided. The cost limitation at issue here permits the burden of cost to eviscerate the civil right. § 317(c) requires the Secretary to establish minimum service criteria for the provision of transportation services to the handicapped, yet the 3% safe harbor cost limitation allows DOT grantees to undercut the Congressional intent of § 317(c) by avoiding compliance with some or all of the service criteria simply by spending a certain percentage of their funds. It is evident from the legislative history of § 317(c) that Congress intended to establish a solid foundation of rights on which the handicapped who desire to use public transporta-

tion could rely. The problem that § 317(c) was to cure was that there were "no minimum standards [and] no bottom lines." [10] § 317(c) was implemented to establish national minimum criteria for the provision of transportation services to the handicapped. While the Secretary should have broad discretion to determine what those criteria ought to be, she may not employ a cost cap to nullify the rights mandated by Congress. Accordingly, the cost cap violates § 317(c).

■ Even if the regulations' spending cap were permissible under § 317(c) it would be arbitrary and capricious based upon the facts before the agency. A regulation is arbitrary and capricious when the agency fails to "articulate a satisfactory explanation for its action, including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Manufacturers Association of the United States*, 463 U.S. at 43, 103 S.Ct. at 2866 (1983), *quoting Burlington Truck Lines v. United States*, 371 U.S. 156 at 168, 83 S.Ct. 239 at 246, 9 L.Ed.2d 207 (1962). In *Motor Vehicle Manufacturers Association of the United States* the Court explained that "[n]ormally, an agency rule would be arbitrary and capricious if the agency ... entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." 463 U.S. at 43, 103 S.Ct. at 2867

(1983). In this case, the decision of the Secretary to impose a 3% spending cap ran contrary to the evidence that the agency had before it. According to DOT and to the Regulatory Impact Analysis published by DOT and filed with this Court, DOT's own studies and information revealed that if the 3% cap were implemented, transit authorities in cities with populations of less than one million people which chose to implement the paratransit option would virtually never be able to meet all of the applicable service criteria within the spending cap.[11] Handicapped users of the public transportation systems in those cities would effectively be denied the minimum quality of service mandated by the Congress in § 317(c). To exclude entire portions of the country from Congressionally mandated minimum service criteria is arbitrary and capricious.[12]

### "Half-Fare" Program

■ The Secretary's allowance of the costs of a "half-fare" program in the 3% cap is also arbitrary and capricious. Even if the 3% safe harbor cost limit is permitted by § 317(c), the Secretary's decision to allow local transit operators to include, as part of the costs included in the meeting of the cost limit the cost of offering "half-fare" discounts to elderly and handicapped passengers during off peak hours is not supported on the administrative record. The "half-fare" program is a part of the National Mass Transportation Assistance Act of 1974, 49 U.S.C. § 1604(m).[13] It is a

---

**10.** 128 Cong.Rec.S. 14742 (daily ed. December 14, 1982).

**11.** DOT Memorandum, p. 101; DOT, *Regulatory Impact Analysis*, pp. viii–ix; 51 Fed.Reg. at 19012.

**12.** In addition, DOT's method of deriving the 3% figure was arbitrary and capricious. The 3% cost cap was based on a study of Milwaukee, Wisconsin done by DOT and of the costs of providing accessible transportation services to the mobility impaired in that city. The fact that Milwaukee may be able to provide accessible buses to its population within the 3% cost cap is of little help in determining how other cities with different populations and who choose to provide different services may fare with the 3% cost limitation. *See* n. 11 and accompanying text, *supra*.

**13.** 49 U.S.C. § 1604(m) provides that "The Secretary shall not approve any project under this section unless the applicant agrees and gives satisfactory assurances, in such manner and form as may be required by the Secretary and in accordance with such terms and conditions as the Secretary may prescribe, that the rates charged elderly and handicapped persons during non peak hours for transportation utilizing or involving the facilities and equipment of the project financed with assistance under this section will not exceed one-half of the rates generally applicable to other persons at peak hours, whether the operation of such facilities and equipment is by the applicant or is by another entity under lease or otherwise."

separate and distinct Congressionally mandated directive to local transit operators which should not relieve those transit operators of their obligations to meet the minimum service criteria of the regulation here at issue. Similarly, the "half-fare" program only benefits those elderly and handicapped individuals whose disability does not affect their capability to use mass transit. The program does nothing to render mass transit systems more accessible to those for whom public transportation is currently unavailable, a clearly expressed goal of the legislators who drafted § 317(c). Though the Secretary should be afforded a good deal of discretion in this area, DOT's inclusion of the "half-fare" program as an eligible cost was contrary to the intention of Congress and was arbitrary and capricious on the facts before it.

*Six Year Phase-In Period*

██ DOT's decision in certain cases and after agency review to delay full implementation of the minimum service criteria until 1993, however, is rational on the administrative record. 49 C.F.R. 27.95(a). DOT concluded that a six-year phase-in period for the applicability of the minimum service criteria would be appropriate because the useful life of a bus is twelve years, so that it could be expected that within a given six year period a local transit operator would replace half of its non-accessible buses with accessible buses as part of its normal cycle of bus replacement. Because the six year phase-in period is the outer limit to which transit authorities may go, and because the regulations provide for a case by case analysis by DOT with respect to the six year implementation period, it cannot, on the face of the administrative record, and without any evidence of arbitrary behavior by DOT, be facially arbitrary and capricious.

I am satisfied that the administrative record submitted for review by the Court is complete. The pre-decisional documents submitted by the defendant for *in camera* inspection are privileged communications and shall remain filed under seal.

I am also satisfied that I should not attempt to re-write the regulations to delete the arbitrary portions and leave the rest. I cannot say that the defendant would have adopted the rest of the regulations in their present form, if the arbitrary portions were subtracted, particularly since compliance costs are a legitimate factor for agency consideration.

I expect the Secretary to move promptly, though it is presently unnecessary to set a timetable.[14] I recognize the difficulty of finding a reasonable path between conflicting goals of equality for the handicapped and cost efficiency, but the search may not take arbitrary shortcuts.

ORDER

AND NOW, this 4th day of January, 1988, it is hereby ORDERED, after a hearing, that the Motion for Summary Judgment of Plaintiffs Americans Disabled For Accessible Public Transportation (ADAPT), et al. and the Motion for Partial Summary Judgment of Plaintiffs Eastern Paralyzed Veterans Association of Pennsylvania, Inc. (EPVA), et al. are GRANTED in part and DENIED in part and Defendant's Cross-Motion for Summary Judgment is GRANTED in part and DENIED in part, as specified in this Memorandum, and that the matter is hereby remanded to the Secretary for proceedings consistent with this Memorandum. This Order is stayed for thirty days to allow time for appeal and, if such an appeal is filed within that period, pending decision by the U.S. Court of Appeals for the Third Circuit.

---

**14.** Former Secretary Dole's successor is automatically substituted as a party. Fed.R.Civ.P. 25(d).